**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| KIMBERLY DOMANTAS, | ) | |
| Plaintiff, | ) | Case No.: 1:21-cv-00232 |
| | ) | |
| v. | ) | Honorable Gabriel A. Fuentes |
| | ) | |
| MENARD, INC. | ) | |
| Defendant. | ) | JURY TRIAL DEMANDED |

**PLAINTIFF'S RESPONSE TO DEFENDANT, MENARD, INC.'S
RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW**

TABLE OF CONTENTS

Points and Authorities ……………………………………………………… ii

Introduction ………………………………………………………………. 1

Facts ……………………………………………………………………… 3

Tammy House's Trial Testimony ………………………………………….. 3

Sandra Guzman's Trial Testimony ……………………………………… 5

Kimberly Domantas' Trial Testimony …………………………………… 10

Defendant's Closing Argument …………………………………………… 10

Legal Standard …………………………………………………………… 11

Argument ………………………………………………………………… 13

A. Plaintiff Submitted Evidence And The Jury Found            13
   Menard Had Knowledge …………………………………………..

B. Plaintiff Presented Ample Evidence To Establish            16
   A Prima Facie Case ………...……….......……...……....……....………

C. This Court Cannot Usurp And Set Aside The                 17
   Jurors' Own Inferences Declaring The Evidence
   Presented At Trial Was Insufficient To Support
   Finding That Menard Was Negligent ……………………………………

Conclusion ………………………………………………………………... 19

## POINTS OF AUTHORITIES

**Introduction** …………………………………………………………………………….. 1

*Diadenko v. Folino*

741 F.3d 751 ……………………………………………………………….......... 1

*Herman v. City of Chicago*

870 F.2d 400 ……………………………………………………………….......... 1

*Blanck v. Cohn*

65 Fed.Appx. 74 ……………………………………………………………........ 1

*Tate v. Executive Mgmt. Servs. Inc.*

546 F.3d 528 ……………………………………………………………...........1

*Villa v. Crown Cork Seal Co.*

202 Ill. App. 3d 1082 …………………………………………………………… 2

*Lee v. Grand Trunk Western R.R. Co.*

143 Ill.App.3d 500 ………………………………………………..……... 2

*Jardine v. Rubloff*

73 Ill.2d 31, 382 N.E.2d 232 ……………………………………………..…… 2

**Facts** ………………………………………………………………………… 3

**Tammy House's Trial Testimony** ……………………………………………………… 3

**Sandra Guzman's Trial Testimony** ………………………………………………… 5

**Kimberly Domantas' Trial Testimony** …………………………….......................... 10

**Defendant's Closing Argument** …………………………………………........ 10

**Legal Standard** ………………………………………………………………….. 11

Fed. R. Civ. P. 50(a) ………………………………………………………… 12

*Massey v. Blue Cross - Blue Shield of Illinois*

226 F.3d 922, 925 ……………………………………………………………… 12

*Filipovich v. K&R Express Sys. Inc.*

391 F.3d 859 …………………………………………………………………… 12

*Tart v. Illinois Power Co.*

366 F.3d 461, 464 ……………………………………………………………… 12

*Reeves v. Sanderson Plumbing Products Inc.*

530 U.S. 133 …………………………………………………………………………… 12

*Harvey v. Office of Banks and Real Estate*

377 F.3d 698 …………………………………………………………………………… 12

*Gustafson v. Jones*

290 F.3d 895 …………………………………………………………………………… 12

*In re Village of Bridgeview* 139 Ill.App.3d 744 …………………………………………….. 12

*Anderson* v. *Liberty Lobby, Inc.,*

*477* U. S. 242 ……………………………………………………………………….. 12

**Argument** ……………………………………………………………………………… 13

*Haslett v. United Skates of America Inc.*

2019 IL App (1st) 181337, ¶ 41 ……………………………………………………….. 13

*Pavlik v. Wal-Mart Stores Inc.,*

323 Ill.App.3d 1060 …………………………………………………………………… 13

*Tomczak v. Planetsphere Inc*

315 Ill.App.3d 1033 …………………………………………………………………… 13

*Domantas v. Menard, Inc.*

21 C 232, 11 (N.D. Ill. Jan. 24, 2022) ………………………………………………… 13

**A.  Plaintiff Submitted Evidence And The Jury Found Menard Had Knowledge** …… 13

Reid v. Kohl's Dept. Stores ………………………………………………………….. 14

Dunn, 880 F.3d 909 …………………………………………………………………… 14

*Domantas v. Menard, Inc.,*

21 C 232, 11 (N.D. Ill. Jan. 24, 2022) ………………………………………………… 15

*Hanna v. Creative Designers, Inc`.,*

63 N.E.3d 1036 ……………………………………………………………………… 15

*United States v. Fulbright,*

105 F.3d 443 ………………………………………………………………………… 15

*United States v. Sanchez-Robles*

 927 F.2d 1070 ……………………………………………………………………… 15

*Tomczak v. Planetsphere Inc.*

315 Ill.App.3d 1033 ……………………………………………………………………….... 16, 17

*Filipovich v. K&R Express Sys. Inc.*

391 F.3d 859 ……………………………………………………………………………… 16

    **B.  Plaintiff Presented Ample Evidence To Establish A Prima Facie Case** …………..  16

*Tart v. Illinois Power Co.*

366 F.3d 461 ……………………………………………………………………………… 16

*Waite v. Board of Trustees of Illinois Comm. College Dist. No. 508*

408 F.3d 339 ……………………………………………………………………………… 16

*Reeves v. Sanderson Plumbing Products Inc.*

530 U.S. 133 ……………………………………………………………………………… 16

    **C.  This Court Cannot Usurp And Set Aside The Jurors' Own Inferences Declaring The Evidence Presented At Trial Was Insufficient To Support A Finding That Menard Was Negligent** ……………………………………………………………………… 17

*Boatmen's Nat. Bank of Hillsboro v. Ward*

231 Ill.App.3d 401 ……………………………………………………………………….. 17

*Ney v. Yellow Cab Co.*

2 Ill.2d 74 ……………………………………………………………………………… 17

*Marchetti v. Lumaghi Coal Co.*

13 Ill.App.2d 526 ……………………………………………………………………… 18

*Lee v. Grand Trunk Western R. Co.*

143 Ill.App.3d 500 ……………………………………………………………………….. 19

*Clarett v Roberts*

 657 F.3d 664 ……………………………………………………………………………… 19

**Conclusion** ……………………………………………………………………………… 19

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| KIMBERLY DOMANTAS, | ) |
| Plaintiff, | ) Case No.: 1:21-cv-00232 |
| | ) |
| v. | ) Honorable Gabriel A. Fuentes |
| | ) |
| MENARD, INC. | ) |
| Defendant. | )JURY TRIAL DEMANDED |

**PLAINTIFF'S RESPONSE TO DEFENDANT, MENARD, INC.'S RENEWED MOTION
FOR JUDGMENT AS A MATTER OF LAW**

NOW COMES, Plaintiff **KIMBERLY DOMANTAS**, by and through her counsel and for her Response, states as follows:

**INTRODUCTION**

Plaintiff respectfully opposes Defendant's Motion. Sufficient evidence was presented at trial for a reasonable jury to find in her favor, and therefore, the motion should be denied. The Defendant not only failed to attach the record or any evidence, but it also neglected to cite to it in order to prove to this Honorable Court that the jurors got it wrong. **(Pl.'s Exhibit A, Defendant's Renewed Motion For Judgment As A Matter Of Law).** The law is clear that the court is not required to scour the record looking for factual disputes nor is the Court required to piece together Defendant's arguments for him. *See Diadenko v. Folino,* 741 F.3d 751, 757; *see also Herman v. City of Chicago,* 870 F.2d 400, 404 ("A district court need not scour the record to make the case of a party who does nothing."). A party's failure to identify evidence in support of his claim, or to explain how his evidence establishes a material question of fact, waives his argument. *Blanck v. Cohn*, 65 Fed.Appx. 74, 76.

In *Tate v. Executive Mgmt. Servs., Inc.* the court said it best, "Once a jury has spoken, we are obliged to construe the facts in favor of the parties who prevailed under the verdict." 546 F.3d

1

528, 531. On May 15, 2024, the jury did just that despite being told, "This plaintiff tried to get her doctor to commit fraud, tried." **(Pl.'s Exhibit F, Trial Transcript, Vol. No. 3 AM 507:8-9**) and "There's no objective evidence whatsoever that her subjective complaints were ongoing or permanent in nature or no diagnostic studies, no expert testimony, no recent treatment." *Id.* 447:13-15. I Villa, the jury spoke loud and clearly and its verdict was properly supported by the evidence. *Villa v. Crown Cork Seal Co.*, 202 Ill. App. 3d 1082, 1089-90 . The verdict will not be altered merely because the jury could have found differently. *Lee,* 143 Ill. App.3d at 512; *Jardine v. Rubloff* , 73 Ill.2d 31, 382 N.E.2d 232.) We have reviewed the record, and we find the jury's verdict to have been properly supported by the evidence. Thus, we have no basis upon which to disturb its findings. Quoting *Villa v. Crown Cork Seal Co.*, 202 Ill. App. 3d 1082, 1089-90. The parties were blessed with a highly educated and intelligent jury composed of an attorney, a nurse, and a schoolteacher, to name a few. The jurors sat and listened to opening statements. During a three (3) day trial, Plaintiff called three (3) witnesses two from Menard, namely Tami House, Sandra Guzman, and herself. Jurors heard direct and cross examinations. They were shown joint exhibits consisting of cat and dog food, photos taken months after the incident, and footage from stationery and a rotating camera located in Menard. Jurors heard stipulations regarding Dr. Murphy; Dr. Doshi's deposition transcript was read into the record, referencing corresponding medical records which were also shown. Lastly, they listened attentively to closing arguments and jury instructions. The jury deliberated for more than one (1) hour and even after being told material misrepresentations by the Defendant's counsel, they ultimately ruled in Plaintiff's on her premises liability claim, thus mooting defendant's motion. Not only did Plaintiff present sufficient evidence, but the jury weighed both the Plaintiff's and Defendant Menard's actions and omissions and despite Plaintiff requesting $190,000.00 in compensation, the jury awarded her

that amount, but reduced it to $114,000.00, finding that she was 40 % contributory negligent. **(Pl.'s Exhibit B, Jury Verdict)**. It would be ludicrous to claim that this jury did not carefully listen to and deliberate on the matters presented to them. There are sufficient facts, if construed in favor of the Plaintiff, which is required by law, which supports the denial of Defendant's motion.

## FACTS

**Tamy House, (Pl.'s Exhibit C, Trial Transcript, Vol. Volume No. 1 pm, May 13, 2024)**

When asked if she would also have to make sure that the aisles were clear from any safety hazards or dangers House replied, "In my register aisle, yes. If someone spilled or something, we would close down that aisle, and we would have to clean that up or process. 17:5-9. If something fell over or something -- products fell off of a cart that someone – guests brought in, I would be picking that up, yes. *Vol 1 PM,* 17:10-12. She said, "If we were busy, we wouldn't make it down to the end of our aisles. 17:17-18. And when we do and we are not waiting on a guest, we'd go to the end of our aisle and would pick things up or move things around." 17:18-20. House testified, "If there's random carts or grocery carts around, they would be moved; or normally, the manager or the head front cashier would go and pick things up or move things." 18:11-13. She was asked why she would let someone know there was a random stray cart or a cart near your end cap or near your register and responded, "I would -- probably because guests are trying to get in and out of my register." 19:8-11. She continued by saying, "They would have an obstacle to get in and out of where I'm working." 19:11-12. When asked what the danger or the hazard could be leaving a cart near the end cap or by the entrance of your register or your lane and House replied, "Well, we're an exit lane. So, if someone is trying to get in and out and there's something blocking those exit lanes.." 20:6-11.

House didn't see the rail cart and the poles protruding from it (28:15-17) nor did she see Domantas actually tripping and falling. 28:18-20. When asked if there was a cart with the poles protruding House replied, "There was a cart there when we were standing there picking things up, but I don't -- really didn't notice anything about the cart in particular." 34:14-18. She was not familiar with the store's policy regarding the placement of carts and other objects in the aisle." 36:22-24. House was asked to describe a typical procedure for handling carts and replied, "If there's anything that would be in our aisles, in particular in our area where we're at, that would be something that one of the front-end managers or that would take care of." 36:25-37:4. One learned different items and things and what to look for but use more common sense than anything. 37:5-9. House did not know if there was a written policy regarding the placement of carts or how carts should be put back to where they belong if a cashier or manager observed them. 37:10-12. When asked if there were any rules or protocol for reporting carts that you see that are out of place at Menard and House replied, "All I know is if I see something that's not in the right place or out of -- out of sorts, I would either take care of it if I had access to it, or it just goes right -- I would make sure someone else was able to take care of it." 37:20-25. She was told that everyone is responsible for safety at Menard and to her, "That's just common sense, so yes." 38:22-24. She agreed that it is common sense that if she or anyone else saw a shopping cart at the end – at the cash register or the end part of the register, that they would move it or notify customers to be aware of it. 39:20-23. She stated, "If I was aware of it, I would have done that." 39:24-25. House was asked if she saw a cart that had objects protruding out, would she call a manager and notify them, and replied, "Yes, I would immediately. If I would have seen something, I would -- definitely would contact one of my managers or front end." 41:1-6. She was asked why she wouldn't wait five or ten minutes to notify a manager if she saw that hazard or safety danger, and House stated, "It doesn't

make sense to wait five or ten minutes for – I wouldn't -- again, it's not -- wouldn't have been my responsibility, but I wouldn't have if I physically saw something." 41:13-18. To her knowledge, House was not given handouts on how to spot potential hazards in the store but, "It's been quite a few years, so..."46:22-24. As far as being given handouts that informed her how to give warnings or communicate safety hazards to patrons in the store, House testified, " I don't recall that." 46:25-47:2. House was never instructed about a specific time frame for rectifying or fixing any safety hazards or dangers during your training. 47:13-16.

**Sandra Guzman, (Pl.'s Exhibit C Volume No. 1 pm, May 13, 2024 2:03 p.m.)**

Guzman did not know when the customer or what time the customer left the cart by Tami's cash register, nor did she know how long the cart was there. 78:22-79:1. When asked if when she noticed the customer did not return, if she thought to go over and see what was inside of the abandoned cart, Guzman responded, "Well, I did see the guest head over to the left-hand side, so I knew it was unattended." When asked again she stated, "No" (79:14-18) "No, I did not head over to see what was in the cart" (80:4) because " I personally did not see any danger for it being to the guests and my fellow friends as team members." 80:5-7. When questioned about when she realized the customer who abandoned the cart did not come back, whether she still chose not to go and investigate to see if there were any hazards in his cart, Guzman stated, "Correct, because I didn't think there would be any danger for it being to my guests or my friends as team members." 80:18-22. Guzman was asked if she knew for certain or for a fact that there were no dangers or hazards, (80:23-24) and she responded, "From the position that I was in, no, I didn't see no view to that." 80:25-81:1. Guzman would not say that she could not see him (customer who abandoned the cart) at all times. 81:22-23. After he walked in a certain direction, Guzman did not know where he went and agreed that she could not see him. 82:1-5. There is more than one camera in Menard. 86:13-15. When asked if there is anything in the center aisle that could show customers stealing and

Guzman stated, "Not specifically that aisle, no" (87:11-13) "I mean, as far as being in the front-end department, I've seen the cameras myself." 87:20-21. Guzman reviewed the video of Plaintiff falling at Menard (87:22-25) possibly five times or less from the dates of the incident. 88:4-7. When asked what part of the cart she could see when she viewed the video (88:24) Guzman stated, "I don't even think you could see the actual cart." 89:3-4. Then when called out, she changed her answer and said, "I'm trying to think. Is it -- okay. I'm trying now to visual what I seen. So, yeah, you could see the cart, yes." 89:5-9. In the video Guzman saw with a manager, she saw a rail cart, one that you use for, like, lumber, any big product. 90:6:14. She thought pipes were sticking out or protruding from the cart when she saw the video, copper pipes. 90:15-91:1.

When asked how long it took for the man to abandon his cart, go to the shelving, and then return to the cart, from the video (92: 3-6) Guzman said from what she had recalled, the video was initially three minutes. 92:7-9. She was asked whether it was three minutes or was it over ten minutes and responded, "Not over ten minutes for sure. I don't recall it being ten minutes." 92:12-15. She was asked if she had seen the video, why she would say it was three minutes when it was longer than that (92:16-17) and she responded, "Because I had initially thought it was three minutes. I had only seen him, from what I have assuming, when he went to the left-hand side" 92:18:20, 93:16-19 "I honestly thought it was three minutes, but obviously if you look at the camera and the video itself, it's about the ten minutes." 92:21-23. She admitted she saw the video from what happened the date of the incident (93:6-7) but after the date of the incident, she gave testimony that, again, it was about three minutes that she observed the cart being abandoned. 93:9-12. While watching the video, Guzman could see Plaintiff trip and fall over the poles that were protruding from the cart (94:5-11) and the pipe sticking out (94:12-13). She saw Plaintiff trip and fall, but then she switched and stated, "Like I said, it's too far  for her to actually see that it was the

pipes. 94:14-17. Then once again, she said she saw the pipe sticking out, in the video. 94:18-19. After Guzman saw the customer abandon the cart and go to the shelves, she didn't put any kind of, like, cones or warning signs near the cart that had the poles protruding from it, because she "…Did not know there was any type of danger for there to me to put anything there." 95:2-7. She was asked if, to her, an abandoned cart with copper poles sticking out was not a danger or a hazard to customers and responded, "I did not see no copper pipe from where I'm stationed. So, no, I did not put that." 95:8-11. Guzman then admitted that she did not see the poles because she did not leave the front desk to go look to see what was in the cart, saying, "Correct, because I'm only stationed at a certain spot." 95:12-14. She was asked if she was saying that she could not leave her spot to go make sure customers are safe and not in danger and replied, "I'm not saying I can't leave for that one specific reason" 95:15-17. "If something was to occur, obviously I would go up to whatever situation was going on." 95:18-19. When asked how many days she spent going over safety, safety hazards, and how to keep customers safe, Guzman testified, "There's not a thing as days for us to go over safety" 96:10-12 "I mean, there is certain occasions where the general managers speaks to the department managers, and the department managers then speaks to the cashiers or whomever is in the department." 96:13-15. She continued saying, "When we get hired, there's definitely videos, multiple videos that you take a look at, go over, speak with HR with; but there's no hours as far as like a specific time. There's no specific hours." 97:7-17. When asked what's in handouts or brochures about how to keep customers safe and protected while they're shopping and Guzman testified, "There's nothing specific as being -- having the customers or anything like that. It's just kind of like awareness" (98:8-12) like, if you see something, go ahead and take care of it." 98:12. On August 15th, 2019, Guzman saw a customer abandon his cart (98:20-22) she was trained that when you see something, you should do something. 98:23-99:1. Guzman

saw him go buy some shelving, and then he went somewhere else." 99:7-11. She was asked again how much time passed from when he abandoned the cart until Plaintiff tripped and fell, and this time she stated, "It was honestly like a minute or two." 102:9-11. She was asked after watching the video, how much time passed from when the customer abandoned the cart until Plaintiff tripped and fell over it and testified, "It was only seconds. So, if you go off the actual video, it was only seconds from when it actually even happened." 102:17-21, 103:4-9. She went on to state, **"Now, the whole time being there cart, it's ten minutes.** From what I actually thought, it was three minutes." 103:10-11. She was asked what she was talking about when she said ten minutes or more passed and stated, "Within the time frame of there being a cart there, I would say." 104:20-23.

When asked when she was a cashier, what she was taught about how to prevent accidents or incidents from happening at the store, Guzman said, "To obviously keep surroundings good and, I mean, well" 108:3-6  "I mean, as a front-end, we really don't encounter anything like that. We just deal with cashiers. Me being the head cashier at the time, obviously just kind of being by my surroundings that is register-wise." 108:6-10. This includes making sure that shopping carts are in their proper places. 108:14-16. The protocol or the rule at Menard regarding abandoned shopping carts is, "If it's officially abandoned, we would initially take it to where it belongs." 108:21-24. The cart is officially abandoned when Guzman was aware that there is no one returning to it. 108:25-109-1. She stated that she would wait possibly after five or six minutes to determine that no one is coming back for the cart. 109:2-4. When asked again if she saw the cart in the video Guzman responded, "A portion of it. I mean, the cart, yeah, itself." 125:21-25. She claims she could not really see the pole sticking out of cart in the video. 126:1-3. When Guzman saw the video, she saw Plaintiff fall, but not necessarily see it being over the poles. 126:8-16. Guzman saw

the pole sticking out of the cart. 127:2-7. The video could have picked up whatever was in the aisle before Plaintiff fell, but it does not. 224:12-16.

Guzman testified on cross that she was taught, if you see something, do something. 224:17-19. On the date of the incident, she saw a customer leave a cart unattended. 224:20-22. She also saw a video on the day of trial that showed him leave the cart for about 10 minutes. 224:23-25. Guzman said her doing something was monitoring the guest activity. 225:1-3. She paid attention and watched the cart he left (225:4-5) but did not move it until Plaintiff tripped and fell over. 225:1-8. She was shown a video at trial of a person with white shoes. 225:9-10. She couldn't see the person's body but saw white shoes. 225:10-11. The person with white shoes returned to the area around 19 minutes and 49 seconds, according to the video. 225:14-17. Guzman stated she was not looking down Tami's aisle, Number 9, or her lane and 225:24-25 she did not know who that individual was. 226:1-5. She would not agree that when the person wearing white shoes returned, they did not stop at the cart. 226:6-8. She claims she told him to move his cart and then Plaintiff tripped and fell. 226:9-12. Guzman couldn't see what was in that cart from her vantage point when she was up front. 226:16-18. Plaintiff's counsel showed Guzman a video at 40 seconds (227:24-25) and Guzman agreed that to the left of Aisle Number 9, that's the aisle she indicated that people walk back and forth. 228:1-4. **Guzman admitted that if the loss prevention specialist wanted to, he could have shown that aisle. 228:5-7.** When asked if the loss prevention specialist had shown us a video of that aisle, could we have seen exactly how long that cart was there, and Guzman stated, "Possibly, yes." 228:11-14. She agreed that we could have seen the individual who actually left the cart. 228:16-18. She stated the video that's in front of Tami's register that was looking straight down the lane couldn't have shown us how many rails were in the cart 228:21-29:1 because, "It's too thin. Once you zoom in, it gets blurry." 229:1-4. Guzman agreed that neither

Joint Exhibit 1A and B, showed a man abandon a cart and go to the shelf to look at product. 231:7-10. She admitted that she was not paying attention and watching the abandoned cart the entire time (233:4-6) the other registers distracted her (233:7-8) and there were other lanes open. 233:9-10. Guzman is not sure how long she looked away from watching the cart (233:15-16) but while she was not watching it could have been when Plaintiff tripped and fell over it. 233:17-19. Guzman testified about another camera's default position in outdoor power, due to the high-theft products that people walk out with. 183:24-184:1. Guzman's attorney stated "Okay. But did we see that footage? **Did someone in that booth save that footage from that camera that day?" Guzman responded, " No."** 184:2-4. Plaintiff's counsel tried asking about this on redirect, which should have been permitted, but instead she was reprimanded by the court. 237:1-5.

**Kimberly Domantas, (Pl.'s Exhibit D, Trial Transcript, Volume No. 2 PM, May 14, 2024 1:00 p.m.)**

Domantas and House had a conversation while she waited about the 20-minute-or-so time and Tammy was upset with the guy that left the cart there. 267:17-19. Domantas said, "She was, like, very sarcastic about it and angry. Like, "Why was it there that long? I thought he was never going to come back." No. "I thought" -- "I thought he went home and came back." (267:17-286:1). House walked away from her part of the register where she was waiting on people when she noticed him come back to his to his cart and said, "She got hurt on your cart." (268:6-8). He actually came up later and apologized when Domantas was at guest services later, and she wouldn't even look at him because she was so mad at him. (268:9-12).

**Defendant's Closing Argument, (Pl.'s Exhibit E, Trial Transcript, Volume No. 3 am)**

Defense counsel told jurors, "The eyes on the ball that *I asked you to pay particular attention to are those evidencing, you know, the hard evidence, not the argument part, not the parts that can be biased or tainted or manipulated, but the hard evidence, the videos, the photos,*

*and the medical records and bills and the testimony of the doctors. I am glad to hear that the Court's going to let you see all of that.*" 494:5-12. Finally, on that hard evidence, I ask you to look on the medical issues, the damages beyond what you see in the video, because you can see -- draw some inferences from her injuries in the video. 506:1-4. Dr. Doshi is next on the hard evidence. You saw the note, and you're going to get to see the note again. You're going to get that record. 507:5-7. This plaintiff asked her doctor to lie. Now, if she's willing to ask her doctor to lie, what else does that tell you about her? That's big. 507:16-18. And then let's talk about what hard evidence you didn't see. I heard a lot of testimony from this person who asked her doctor to lie for her about all the other doctors she saw, all the other miscellaneous undescribed MRIs and CTs and PTs. Where are the medical bills? 507:19-23. We don't know. You're supposed to rely on the evidence in this case, not these aloof, yeah, it hurt; yeah, I went to this doctor; I had a lot of treatment. I'm not denying that. We know why that happened. She has degenerative spine from lumbar to -- well, actually, from cervical to lumbar through Dr. Doshi's testimony. She also has osteoarthritis, and she has fibromyalgia. 508:7-13. This is the simple one, Verdict Form C. If you find that she didn't meet that element, you go to Verdict Form C. The plaintiff didn't prove we knew or should have known of that hazard of the pole, you go right to C. 512:12-15. So, I think the evidence is -- strongly supports that you have to use Verdict Form C for the defendant, because we're not legally responsible under Illinois law because we didn't have notice of the hazard. So, I ask you -- I thank you for your time and ask you to consider using Verdict Form C as you deliberate in the back. Thank you for your time. 513:21-514:2.

## LEGAL STANDARD

Ironically, Defendant acknowledges the standard for its motion, but argues the evidence in the light most favorable to itself, dismissing at minimum the testimony of Domantas. Per Rule

50 of the Federal Rules of Civil Procedure, a district court may enter judgment against a party if "a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." (Fed. R. Civ. P. 50(a)). This high standard is reinforced in *Massey v. Blue Cross - Blue Shield of Illinois*, 226 F.3d 922, 925, and *Filipovich v. K&R Express Sys., Inc.,* 391 F.3d 859, 863. In deciding such a motion, the court must construe the evidence strictly in favor of the party who prevailed before the jury and should examine the evidence only to determine whether the jury's verdict could reasonably be based on that evidence *Tart v. Illinois Power Co*., 366 F.3d 461, 464; citing *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150–51. The Court's job is not to determine whether the jury believed the right people, but only to assure that it was presented with a legally sufficient basis to support the verdict. *Harvey,* 377 F.3d at 707. In other words, when entertaining a motion for judgment as a matter of law, the Court should review all of the evidence in the record and must draw all inferences in favor of the nonmoving party. *Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 150-51; *Gustafson v. Jones,* 290 F.3d 895, 906. In ruling on the motion, the trial judge may not substitute his judgment for that of the jury as to the credibility of witnesses and he may not determine the preponderance of the evidence. *In re Village of Bridgeview*, 139 Ill.App.3d 744, 753. The Court may not make credibility determinations or reweigh the evidence; it must disregard all evidence favorable to the moving party that the jury is not required to believe. *Reeves,* 530 U.S. at 150-51; see also *Harvey v. Office of Banks and Real Estate,* 377 F.3d 698, 707. The latter evidence, along with the drawing of legitimate inferences from the facts, are for the jury, not the court. *Anderson* v. *Liberty Lobby, Inc., 477* U. S. 242, 255. There are sufficient facts if construed in favor of the Plaintiff that support denial of Defendant's motion.

**ARGUMENT**

At the close of Plaintiff's case, the defense orally moved under Rule 50(a) for judgment as a matter of law. That motion was rightfully denied. As for breach of duty in the context of premises liability, Illinois courts "have repeatedly held that a business owner breaches its duty to an invitee who slips on a foreign object in three circumstances: (1) where the object was placed there by the negligence of the proprietor; (2) his servants knew of its presence; or (3) the object was there a sufficient length of time so that, in the exercise of ordinary care, its presence should have been discovered (i.e., the proprietor had constructive notice of the object)." *Haslett v. United Skates of America, Inc.,* 2019 IL App (1st) 181337, ¶ 41. If there is no evidence that the premises owner defendant placed the object or created the hazardous condition, such defendants "can only be held liable if they knew of the hazard's presence, i.e., had either actual or constructive notice" of the hazard. *Id.*, ¶ 52; *Pavlik*, 323 Ill.App.3d at 1064. *See also Pavlik v. Wal-Mart Stores, Inc.,* 323 Ill.App.3d 1060, 1064; *Tomczak v. Planetsphere, Inc.,* 315 Ill.App.3d 1033, 1038 (1st Dist. 2000) (stating that if "the landowner did not create the condition, the plaintiff must be required to establish that the landowner knew or should have known of the defect"). Citing *Domantas v. Menard, Inc.*, 21 C 232, 11 (N.D. Ill. Jan. 24, 2022). In this case, it is clear that Menard knew or should have known about the abandoned cart, poles protruding from it, and the risk is posed to Domantas.

### A. Plaintiff Submitted Evidence And The Jury Found Menard Had Knowledge.

It is unconscionable for Defendant to now utter, "Plaintiff did not present any evidence for the Jury to find in her favor that Defendant knew or in the exercise of ordinary care should have known of the condition and the risk posed by the long, skinny pole that was sticking out of a customer's cart that was located at the endcap to the aisle Plaintiff was walking down." The testimony of Defendant's employees, Tami House and Sandra Guzman, provides sufficient basis

13

to infer both actual and or constructive knowledge. Defendant cites *Reid v. Kohl's Dept. Stores* a case where the district court granted Kohl's motion for summary judgment on September 19, 2007, finding that Kohl's had no actual or constructive notice of the spill prior to Reid's fall and that the spilled milkshake was an open and obvious condition and that Kohl's owed no legal duty to protect against. Menard fails to acknowledge the "distraction exception" applies when the defendant "has reason to expect that the invitee's attention may be distracted, so that he will not discover what is obvious, or will forget what he has discovered, or fail to protect himself against it." *Dunn,* 880 F.3d at 909. " *Domantas v. Menard, Inc.*, 21 C 232, 8 (N.D. Ill. Jan. 24, 2022). The record is clear Domantas was distracted while looking for an open checkout lane and both House and Guzman knew customers might be distracted while trying to check out and leave the store.

In this case, there is ample evidence to suggest that Defendant had knowledge, actual or constructive, of both the hazards of abandoned carts in general and the actual one that had the long, skinny pole(s), protruding from the customer's cart. Domantas testified that Tammy was upset with the guy that left the cart there. 267:17-19. Domantas said, "She was, like, very sarcastic about it and angry. Like, "Why was it there that long? I thought he was never going to come back." No. "I thought" -- "I thought he went home and came back." (267:17-286:1). Guzman testified, "I knew it was unattended." When asked if she went over to see about the cart she stated, "No." 79:14-18 "No, I did not head over to see what was in the cart" (80:4) because " I personally did not see any danger for it being to the guests and my fellow friends as team members." 80:5-7. Guzman admitted that she did not see it because she did not leave the front desk to go look to see what was in the cart, saying, "... Because I'm only stationed at a certain spot." 95:-12-14. Regardless, Guzman cannot choose willful ignorance as an excuse. Cases have recognized,

deliberate ignorance, otherwise known as willful blindness, is categorically different from negligence or recklessness. *See, e.g., United States v. Fulbright,* 105 F.3d 443, 447 (9th Cir.1997); *United States v. Sanchez-Robles,* 927 F.2d 1070, 1073 (9th Cir.1991). A willfully blind defendant is one who took *deliberate* actions to avoid confirming suspicions of criminality. Though this is a civil case, the same concept should be applicable.

Guzman claims she paid attention and watched the cart he left (225:4-5) but she did not move it until Plaintiff tripped and fell over. 225:1-8. She admitted that she was not paying attention and watching this cart he abandoned the entire time (233:4-6). Guzman is not sure how long she look away from watching the cart (233:15-16) but while she was not watching it, that could be when Plaintiff tripped and fell over it. 233:17-19. Guzman claims she did not know for certain that there were no dangers or hazards, (80:23-24) from the position she was in. 80:25-81:1. The presence of an abandoned cart near the checkout lane, where most customers must pass by to check out, is a hazard in itself. One with a protruding pole(s) in a visible area of the store for an extended period should have alerted Defendant's employees to the potential hazard. *Hanna,* 63 N.E.3d at 1046. The cart was there for at least 10 minutes according to the videos that were shown to jurors with the man in the white shoes walking back and forth. This knowledge, coupled with the nature of the hazard abandoned carts and those with protruding poles, suggests that Defendant should have known about the risk it posed *Hanna v. Creative Designers, Inc.,* 63 N.E.3d 1036, 1046; *Tomczak v. Planetsphere, Inc.,* 315 Ill.App.3d 1033, 1038. The fact that the cart was unattended and visible to employees supports the argument that Defendant knew or should have known about it and the protruding pole(s). House and Guzman testified that employees and customers regularly walked past the endcap where the pole was sticking out of the cart. Both Guzman and House knew the hazards that abandoned carts could cause and that

15

the customer left it there for *sufficient time* that it should have been discovered by the exercise of ordinary care. It was foreseeable that Defendant's staff should have noticed and remedied the hazard. This evidence is sufficient for a jury to conclude that Defendant had actual or constructive knowledge of the dangerous condition. See *Filipovich v. K&R Express Sys., Inc.,* 391 F.3d 859, 863. Plaintiff submitted sufficient evidence to show that Defendant had actual or constructive notice of the danger and the jurors agreed.

### B. Plaintiff Presented Ample Evidence To Establish A Prima Facie Case.

At trial Plaintiff presented ample evidence to make a prima facie case to the jury. As a result, they had a right to believe Domantas and return a verdict in her favor. Most of the cases cited by the Defendant proves that this court should deny its motion. Defendant cited See *Tart v. Illinois Power Co.,* 366 F.3d 461, 464, but *Tart* supports Plaintiff's position. In *Tart v. Illinois Power Company*, 366 F.3d 461, the 7th Circuit reinstated a jury's verdict in favor of the Plaintiff after a district court judge had granted defendants' Rule 50 motion for judgment as a matter of law. "Because the district court construed several key facts in favor of the losing parties… we reverse and remand with directions to reinstate the jury's verdict in favor of the Plaintiff ." *Tart* at 464. In *Tart,* the United States Court of Appeals, Seventh Circuit, ruled, "We may not substitute our judgment for that of the jury. 366 F.3d 461, 473. Defendant also cites W*aite v. Board of Trustees of Illinois Comm. College Dist. No. 508*, 408 F.3d 339, 343, citing *Reeves*, 530 U.S. at 150, 120 S.Ct. 2097, but in *Waite,* the court held, "In so doing, however, the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves,* 530 U.S. at 150, 120 S.Ct. 2097. Furthermore, in Waite the court held, Because evidence was presented which tended to show that Armster's reasons for treating Woods differently than *Waite* were questionable, the jury was entitled to

16

reject Armster's testimony. In fact, the district court found that it was reasonable for the jury to disbelieve Armster's testimony because she was "less than candid," "failed to explain her actions satisfactorily," and was not a "particularly good witness." (April 21, 2004 Tr. at 4). 408 F.3d 339, 343- 344. The same can be said for Guzman. The court stated, in sum, we "will overturn a jury verdict for the plaintiff only if we conclude that no rational jury could have found for the plaintiff....". This is obviously a difficult standard to meet.

### C. This Court Cannot Usurp And Set Aside The Jurors' Own Inferences Declaring The Evidence Presented At Trial Was Insufficient To Support A Finding That Menard Was Negligent.

The genuine factual disputes were uniquely within the jury's domain, and this court cannot take these disputes and issues away from them after it rendered a verdict. The court has no right to usurp the jury's decision simply because it would have decided the matter differently. *Boatmen's Nat. Bank of Hillsboro v. Ward*, 231 Ill.App.3d 401, 410. To withdraw from the jury the determination of questions of fact is to usurp its function. *Ney v. Yellow Cab Co*., 2 Ill.2d 74, 84. The evidence must be viewed in the light most favorable to the opponent, Domantas, and the fact her version of how the underlying events resulted in injuries differ from Defendant's is not decisive. This court cannot say that the evidence, when viewed most favorably to the Plaintiff, failed to establish the necessary elements of premises liability or that the evidence so overwhelmingly favored the Defendant, that no contrary verdict could ever stand. Contrary to what Defendant wants this court to believe, the jury was not obligated to reject Plaintiff's version of the facts because they differed from Defendant's.

This case presents a simple question of credibility and the Defendant's entire argument assumes that Tami House and Sandra Guzman were telling the truth and Domantas was not. The jury chose not to believe Menard or at least not Guzman, who either refused to answer questions,

saw the customer who abandoned the cart, but then did not see him the entire time, change the time the cart was there until Plaintiff fell more than three times, as well as testified that she saw a video that show Plaintiff fall and what she fell over, all while jurors watched and listened to her. The law is clear, when there is any evidence, however slight, which tends to support or establish the issue, a motion for directed verdict should not be allowed and the cause should be submitted to a jury. *Marchetti v. Lumaghi Coal Co.*, 13 Ill.App.2d 526, 528. There still must be a *total failure* of the evidence to prove any necessary element of the Plaintiff's case for the Court to grant Defendant's motion and quite the opposite occurred. In this case, throughout the trial, in Defendant's Post-Trial Motion, and in Plaintiff's Response the parties have both offered so much conflicting evidence regarding the facts and evidence. Because so much was in dispute and still is, the jury was uniquely qualified to resolve the conflict between the parties and it did, by totally finding in Plaintiff's favor. Moreover, in light of Domantas, House, Guzman's live and conflicting testimony, photos were presented at trial that were not taken on the date of the incident, and surveillance camera footage appeared to only show what the Defendant wanted the jury to see, someone in the booth did not save footage from a camera on the date of the incident (184:2-4), this court could not say that the evidence so overwhelmingly favored the Defendant, that no contrary verdict based on that evidence could ever stand. Plaintiff, the nonmoving party provided enough proof at trial and her response to show that the evidence did not overwhelmingly favor the moving party. Construing the evidence in the light most favorable to the Plaintiff means accepting of Domantas' testimony and the inferences therefore that inure in her favor.

Again, Domantas' case against Menard was replete with substantial factual disputes from start to finish. The jurors heard all the questions and answers but were also able to directly observe the witnesses' body language and determined their credibility. This is not a case where the court

has the right as a matter of law to resolve the substantial factual disputes. Domantas was entitled to a trial to enable jurors to determine where the truth lies. Here, each party's version of the facts as to how the incident occurred, while different, was clear, most of the time. Those differences merely created questions of fact and issues of credibility for the jury, not a mandate for a judgment as a matter of law. Moreover, even the evidence demonstrates a substantial factual dispute, or where the assessment of credibility of the witnesses or the determination regarding conflicting evidence may be decisive of the outcome, it is error to enter a judgment notwithstanding the verdict. *Lee v. Grand Trunk Western R. Co.,* 143 Ill.App.3d 500, 509. The determination of whether Menard was negligent was dependent on an assessment of Domantas, House, and Guzman's credibility, which was for the jury to resolve. If the jury believed the Menard employees, it would have found for the Defendant. However, based on its verdict, it is apparent that the jury discredited at least Guzman's testimony. It was entitled to believe Domantas, thereby refuting this basis of the other. *Clarett,* 657 F.3d 664, 674. (Plaintiff "telling of events differed sharply from that of the officers, and it was entirely the jury's province to choose which version to believe").

## CONCLUSION

The jury's verdict in favor of the Plaintiff is supported by a legally sufficient evidentiary basis and should be upheld. Defendant's motion should be denied also because it is not entitled to judgment as a matter of law. The jury has spoken and simply because Menard does not now like what it said, does not give it the right to start over.

Dated: July 29, 2024,                    Respectfully submitted,
                                          /s/ Danielle A. Pinkston
                                          _____
                                          Danielle A. Pinkston
                                          Pinkston Law Group, P.C.
                                          54 N. Ottawa St., Ste. #110 Joliet, IL 60432
                                          Office: (773) 770-4771
                                          dpinkston@pinkstonlawgroup.com