**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| KIMBERLY DOMANTAS, | ) | |
| Plaintiff, | ) Case No.: 1:21-cv-00232 | |
| | ) | |
| v. | ) Honorable Gabriel A. Fuentes | |
| | ) | |
| MENARD, INC. | ) | |
| Defendants. | ) JURY TRIAL DEMANDED | |

**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT, MENARD, INC.'S MOTION FOR A NEW TRIAL AND/OR FOR REMITTITUR**

## Table Of Contents

Points and Authorities …………………………………………………………………… i

Introduction …………………………………………………………………………… 1

Facts …………………………………………………………………………………... 2

Tamy House(Th) Volume No. 1 Pm, May 13, 2024 …………………………………… 2

Sandra Guzman (Sg), Volume No. 1 Pm, May 13, 2024 2:03 P.M. …………………………….. 4

Kimberly Domantas, Volume No. 2 Pm, May 14, 2024 1:00 P.M. …………………………. 9

Defendant's Closing Argument, Volume No. 3 Am ……… …………………………………... 14

Legal Standard …………………………………………………………………… 15

Argument ……………………………………………………………………… 16

    A. Domantas' Medical Records Were Appropriately Published To The Jury …………… 16

    B. This Court Did Not Err Because The Defendant Introduced Plaintiff's Records ……… 16

    C. There Was No *Unfair Prejudice* In Admitting Plaintiff's Medical Records …………... 17

    D. Plaintiff's Medical Records Should Have Been Given To The Jury Because
       The Parties Agreed That They Would Be Introduced At Trial In Their Pretrial Memo... 19

    E. Plaintiff's Medical Records Should Have Been Shown To The Jury To Refute
       Defendant's   False Accusations About Her Moral Character And Assessment Of Her
       Injuries ………………………………………………………………… 19

    I. Menard Is Not Entitled To A Remittitur …………………………………………... 20

    A. The Jury Award For Plaintiff Was Not "Monstrously Excessive" ………………….... 21

    B. There Was A Rational Connection Between The Award And Evidence ……………… 22

    C. The Award Is Roughly Comparable To Awards Made In Similar Cases ……………… 23

V. Conclusion ……………………………………………………………………….. 25

## POINTS AND AUTHORITIES

**INTRODUCTION** ………………………………………………………………………... 1

*Diadenko v. Folino*

741 F.3d 751 …………………………………………………………………………… 1

*Herman v. City of Chicago*

870 F.2d 400 …………………………………………………………………………… 1

*Blanck v. Cohn*

65 Fed.Appx. 74 ……………………………………………………………………… 1

**FACTS** ……………………………………………………………………….......... 2

**Tamy House(TH) Volume No. 1 pm, May 13, 2024** ……………………………… 2

**Sandra Guzman (SG), Volume No. 1 pm, May 13, 2024 2:03 p.m.** ………………………… 4

**Kimberly Domantas, Volume No. 2 PM, May 14, 2024 1:00 p.m.** …………………………... 9

**Defendant's Closing Argument, Volume No. 3 am** ……………………………………… 14

**LEGAL STANDARD** ……………………………………………………………… 15

*Davis v. Wisconsin Dept. of Corrections* ……………………………………………... 15

445 F.3d 971 ………………………………………………………………………... 15

*Naeem v. McKesson Drug Co.,*

444 F.3d 593 ………………………………………………………………………… 15

*Susan Wakeen Doll Co., Inc. v. Ashton Drake Galleries*

272 F.3d 441…………………………………………………………………………... 15

*King v. Harrington*

447 F.3d 531 ………………………………………………………………………… 15

*Holmes v. Elgin, Joliet & Eastern Ry. Co.,*

18 F.3d 1393 ………………………………………………………………………… 15

*Am. Nat. Bank & Trust Co. v. Reg'l Transp. Auth.,*

125 F.3d 420 ………………………………………………………………………… 15

*Spina v. Forest Preserve Dist. of Cook County*

207 F. Supp. 2d 764 ………………………………………………………………... 15

*Cygnar v. City of Chicago*

865 F.2d 827 ………………………………………………………………………… 15

*Galard v. Johnson*

504 F.2d 1198 ……………………………………………………………………....... 15

*Huff v. White Motor Corp.*,

609 F.2d 286 …………………………………………………………………….. 15

*Farfaras*

433 F.3d at 566 …………………………………………………………………15

*Deloughery v. City of Chicago*

422 F.3d 611 …………………………………………………………………… 16

**ARGUMENT** ………………………………………………………………… 16

    **A.  Domantas' Medical Records Were Appropriately Published To The Jury** ………. 16

*United States v. Loughry*, 738 F.3d 166 ……………………………………………... 16

    **B.  This Court Did Not Err Because The Defendant Introduced Plaintiff's Records** …16

*Coleman v. Frierson*, 607 F.Supp. 1566 …………………………………………….. 16

    **C.  There Was No *Unfair Prejudice* In Admitting Plaintiff's Medical Records** ………. 17

*United States v. Loughry*, 738 F.3d 166 ……………………………………………... 17

*Cook*, 783 F.2d 684 ………………………………………………………………... 17

*United States v. Adame*, 827 F.3d 637 …………………………………………….. 17

*Cook v. Hoppin*

783 F.2d 684 …………………………………………………………………… 17

Rule 403 ……………………………………………………………………….... 17

*United States v. McRae*

593 F.2d 700 …………………………………………………………………… 18

*United States v. Medina*

755 F.2d 1269………………………………………………………………….. 18

*Cook*

783 F.2d 684 …………………………………………………………………… 18

*United States v. Hattaway*

740 F.2d 1419 ………………………………………………………………….. 18

*Medina*

755 F.2d at 1274 ……………………………………………………………….. 18

Fed.R.Evid. 403. ……………………………………………………………….. 18

J. Weinstein and M. Berger, *Weinstein's* Evidence

¶ 40303 …………………………………………………………………………. 18

*United States v. Zeuli,*

725 F.2d 813 …………………………………………………………………… 18

    **D. Plaintiff's Medical Records Should Have Been Given To The Jury Because The Parties Agreed That They Would Be Introduced At Trial In Their Pretrial Memo** ........................................... 19

    **E. Plaintiff's Medical Records Should Have Been Shown To The Jury To Refute Defendant's False Accusations About Her Moral Character And Assessment Of Her Injuries** ............................... 19

*Malanowski v. Jabamoni*

 332 Ill. App. 3d 8 ..................................................................... 20

*United States v. Adame*

827 F.3d 637 ............................................................................ 20

*Deicher v. City of Evansville, Wis.,*

545 F.3d 537 ............................................................................ 20

*Gossard v. Kalra*

291 Ill. App. 3d 180 ................................................................ 20

**MENARD IS NOT ENTITLED TO A REMITTITUR** ............................................ 20

See *Lau v. West Towns Bus Co.,*

16 Ill.2d 442 ............................................................................ 20

*Marchese v. Vincelette*

261 Ill.App.3d 520 .................................................................. 20

*Farfaras v. Citizens Bank and Trust of Chicago,*

433 F.3d 558 ............................................................................ 20

*American Nat. Bank & Trust Co. of Chicago v. Regional Transp. Authority*

125 F.3d 420 ............................................................................ 20

*Latino v. Kaizer*

58 F.3d 310 ............................................................................ 20

*Cygnar v. City of Chicago*

865 F.2d 827 ............................................................................ 20

T *Gasperini v. Center for Humanities, Inc.,*

518 U.S. 415 ............................................................................ 20

*Medcom Holding Company v. Baxter Travenol Laboratories, Inc.,*

106 F.3d 1388 .......................................................................... 21

*In re Busse*

*124 Ill.App.3d 433* .................................................................. 21

*Jabat, Inc. v. Smith*

201 F.3d 852 …………………………………………………………………… 21

11 Wright & Miller

§ 2806, at 49 …………………………………………………………………… 21

*Coleman v. Frierson*

607 F.Supp. 1566 ……………………………………………………………… 21

**The Jury Award For Plaintiff Was Not "Monstrously Excessive"** ………………………... 21

*Fleming v. Canty. of Kane*

898 F.D.A. 553 ………………………………………………………………… 21

*Deloughery*

422 F.3d at 619 ………………………………………………………………… 22

*Harvey v. Office of Banks & Real Estate*

377 F.3d 698 …………………………………………………………………… 22

See *Harvey v. Office of Banks & Real Estate,*

377 F.3d 698 …………………………………………………………………… 22

*EEOC v. AIC Sec. Investigations, Ltd.,*

55 F.3d 1276 …………………………………………………………………… 22

**There Was A Rational Connection Between The Award And Evidence** …………………….. 22

*Adams v. City of Chicago*

798 F.3d 539 …………………………………………………………………… 22

*Richter v. Northwestern Memorial Hospital*

177 Ill.App.3d 247 …………………………………………………………….... 22

*Deloughery v. City of Chicago,*

422 F.3d 611 2004 U.S.Dist. Lexis 9102, (02 C 2722) (N.D. Ill. 2004) *Id.* at 13. ……………. 23

*O'Sullivan v. City of Chicago*

 474 F. Supp. 2d 971 ………………………………………………………… 23

*Arave v. Creech*

507 U.S. 463 …………………………………………………………………… 23

*Waits v. City of Chicago*

No. 01 C 4010, 2003 WL 2130277 …………………………………………… 23

**The Award Is Roughly Comparable To Awards Made In Similar Cases** ………………… 23

*Avitia v. Metropolitan Club of Chicago, Inc.*

49 F. 3d 1219 ……………………………………...…………………………… 23

*Williams* at 1469 …………………………………………………………………23

*Williams* at 1469 …………………………………………………………………24

iv

*Tierney v. Community Memorial General Hospital*

268 Ill.App.3d 1050 …………………………………………………………………… 24

*Northern Trust Co. v. County of Cook*

135 Ill.App.3d 329 …………………………………………………………………….. 24

Quoting *Richardson v. Chapman*

175 Ill.2d 98 …………………………………………………………………………… 24

*Farfaras* the. *Farfaras v. Citizens Bank and Trust of Chicago*

433 F.3d 558 …………………………………………………………………………... 24

E.g., E.*E.O.C. v. AIC Security Investigations, Ltd*.

55 F.3d 1276 …………………………………………………………………………… 24

*Juan Trevino v AMB Financial Corps,. D/B/A American Savings FSB*

2012 WL 3792835 …………………………………………………………………….. 24

*Robert Knaus v Schunck Markets*

IV SWIL 4-9, 1995 WL 17008095 …………………………………………………… 24

*Madeloe Weil v Walmart,*

1995 WL 17008145 …………………………………………………………………… 24

*Caroline Smith v J.H. Findor & Son*

 2012 WL 7811637 ………………………………………………………………….. 25

**V. CONCLUSION** …………………………………………………………………… 25

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| KIMBERLY DOMANTAS, | ) |
| Plaintiff, | ) Case No.: 1:21-cv-00232 |
| | ) |
| v. | ) Honorable Gabriel A. Fuentes |
| | ) |
| MENARD, INC. | ) |
| Defendants. | ) JURY TRIAL DEMANDED |

**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT, MENARD, INC.'S
MOTION FOR A NEW TRIAL AND/OR FOR REMITTITUR**

NOW COMES Plaintiff KIMBERLY DOMANTAS by and through her counsel, and for her Response, states as follows:

**INTRODUCTION**

After losing at a jury trial, Defendant now argues that the Court erred by allowing Plaintiff's entire medical records to accompany the jury during deliberations and that the jury's award was excessive. However, the Court's decision was proper, and the jury's award is supported by the evidence presented at trial. The Court should deny granting Menard a remittitur or new trial. Defendant not only failed to attach the record or any evidence, but it also neglected to cite to it in order to prove this Honorable Court and the jurors got it wrong. **(Pl.'s Ex. A, Motion).** The law is clear that the court is not required to scour the record looking for factual disputes nor is the Court required to piece together Defendant's arguments for him. *See Diadenko v. Folino,* 741 F.3d 751, 757; *see also Herman v. City of Chicago,* 870 F.2d 400, 404 ("A district court need not scour the record to make the case of a party who does nothing."). A party's failure to identify evidence in support of his claim, or to explain how his evidence establishes a material question of fact, waives his argument. *Blanck v. Cohn,* 65 Fed.Appx. 74, 76. Moreover, the court did not err in allowing the entirety of Plaintiff's

medical records to accompany the jury in its deliberations because 1). The parties in their Amended Pre-Trial Memo, agreed that Dr. Doshi's Deposition Transcript would be read the jury and that Plaintiff's records from this doctor's office would be admitted into evidence as well. **(Pl.'s Group Ex. G, Order and Pre-Trial Memo).** 2). The Defendant introduced the records in its entirely into evidence, 3). Plaintiff did not object to the medical records being entered, and 4). The trial court moved all of the medical records into evidence, and 5). Defendant argued "This plaintiff tried to get her doctor to commit fraud, tried." **(Pl. Ex. F, Vol. No. 3 AM 507:8-9)** and "There's no objective evidence whatsoever that her subjective complaints were ongoing or permanent in nature or no diagnostic studies, no expert testimony, no recent treatment." *Id.* 447:13-15.

Alternatively, Menard believes it is entitled to a remittitur. Plaintiff respectfully asks this court to deny Defendant's motion because there is a rational connection between the jury's award and the evidence, and the Defendant is not entitled to a new trial or a do over because it lost. In fact, not only did Plaintiff present sufficient evidence, but the jury weighed both the Plaintiff's and Defendant Menard's actions, evidence of such is despite Plaintiff requesting $190,000.00 in compensation, the jury awarded her that, but reduced it to $114,000.00, due to its finding that she was 40% contributorily negligent. **(Pl.'s Ex. B Verdict).** Moreover, Defendant did not present the jurors with an alternative suggested amount nor has it suggested to this court an amount for a remittitur, instead it continues to throw things onto the wall, hoping something will stick or that someone will help it out.

## FACTS

**Tamy House (TH) (Pl.'s Exhibit C, Trial Transcript, Vol. Volume No. 1 pm, May 13, 2024)**

TH stated, "In my register aisle, yes. If someone spilled or something, we would close

down that aisle, and we would have to clean that up or process. 17: 5-9. If something fell over or something -- products fell off of a cart that someone – guests brought in, I would be picking that up, yes. *Vol 1 PM,* 17:10-12. TH testified, "If there's random carts or grocery carts around, they would be moved; or normally, the manager or the head front cashier would go and pick things up or move things." 18:11-13. TH would probably let someone know there was a random stray cart or a cart near her end cap or near your register because guests are trying to get in and out of her register. 19:8-11. They would have an obstacle to get in and out of where she's working. 19:11-12. When asked what the danger or the hazard could be leaving a cart near the end cap TH replied, "Well, we're an exit lane. So, if someone is trying to get in and out and there's something blocking those exit lanes.." 20:6-11. She was not familiar with the store's policy regarding the placement of carts and other objects in the aisle." 36:22-24. TH was asked to describe a typical procedure for handling carts and replied, "If there's anything that would be in our aisles, in particular in our area where we're at, that would be something that one of the front-end managers or that would take care of." 36:25-37:4. TH did not know if there was a written policy regarding the placement of carts or how carts should be put back to where they belong if a cashier or manager observed them. 37:10-12. When asked if there were any rules or protocol for reporting carts that you see that are out of place at Menard and TH replied, "All I know is if I see something that's not in the right place or out of -- out of sorts, I would either take care of it if I had access to it, or it just goes right -- I would make sure someone else was able to take care of it." 37:20-25. She was told that everyone is responsible for safety at Menard and to her, "That's just common sense, so yes." 38:22-24. She agreed that it is common sense that if she or anyone else saw a shopping cart at the end – at the cash register or the end part of the register, that they would move it or notify customers to be aware of it. 39:20-23. She stated, "If I was aware of it, I

would have done that." 39:24-25. TH was asked if she saw a cart that had objects protruding out, would she call a manager and notify them, and replied, "Yes, I would immediately. If I would have seen something, I would -- definitely would contact one of my managers or front end." 41:1-6. She was asked why she wouldn't wait five or ten minutes to notify a manager if she saw that hazard or safety danger, and TH stated, "It doesn't make sense to wait five or ten minutes for – I wouldn't -- again, it's not -- wouldn't have been my responsibility, but I wouldn't have if I physically saw something." 41:13-18. TH was never instructed about a specific time frame for rectifying or fixing any safety hazards or dangers during your training. 47:13-16. Where Plaintiff fell there was an aisle -- an open aisle, where product was stored on shelves, but TH had no knowledge of whether there were cameras in the that center aisle where customers walk back and forth. 69:20-70:5. The purpose of the cameras is to make sure that customers do not steal or take product from Menard, but again, TH did not have knowledge of how many there were. 71:5-9.

**Sandra Guzman (SG), (Pl.'s Exhibit C, Trial Transcript, Vol. 1 pm, May 13, 2024 2:03 p.m. and Ex. D, Vol 2)**

Guzman did not know when the customer, what time the customer left the cart by Tami's cash register, nor did she know how long the cart was there. 78:22-79:1. When asked if when she noticed the customer did not return, if she thought to go over and see what was inside of the abandoned cart, SG responded, "Well, I did see the guest head over to the left-hand side, so I knew it was unattended." When asked again she stated, "No" (79:14-18) "No, I did not head over to see what was in the cart" (80:4) because " I personally did not see any danger for it being to the guests and my fellow friends as team members." 80:5-7, 80:18-22. SG was asked if she knew for certain or for a fact that there were no dangers or hazards, (80:23-24) and she responded, "From the position that I was in, no, I didn't see no view to that." 80:25-81:1. SG would not say

4

that she could not see him (customer who abandoned the cart) at all times. 81:22-23. After he walked in a certain direction, SG did not know where he went and agreed that she could not see him. 82:1-5. There is more than one camera in Menard. 86:13-15. When asked if there is anything in the center aisle that could show customers stealing and SG stated, "Not specifically that aisle, no" (87:11-13) "I mean, as far as being in the front-end department, I've seen the cameras myself." 87:20-21. SG reviewed the video of Plaintiff falling at Menard (87:22-25) possibly five times or less from the dates of the incident. 88:4-7. When asked what part of the cart she could see when she viewed the video (88:24) SG stated, "I don't even think you could see the actual cart." 89:3-4. Then when called out, she changed her answer and said, "I'm trying to think. Is it -- okay. I'm trying now to visual what I seen. So, yeah, you could see the cart, yes." 89:5-9. In the video SG saw with a manager, she saw a rail cart, one that you use for, like, lumber, any big product. 90:6:14. She thought pipes were sticking out or protruding from the cart when she saw the video, copper pipes. 90:15-91:1.

When asked how long it took for the man to abandon his cart, go to the shelving, and then return to the cart, from the video (92: 3-6) SG said from what she had recalled, the video was initially three minutes. 92:7-9. She was asked whether it was three minutes or was it over ten minutes and responded, "Not over ten minutes for sure. I don't recall it being ten minutes." 92:12-15. She was asked if she had seen the video, why she would say it was three minutes when it was longer than that (92:16-17) and she responded, "Because I had initially thought it was three minutes. I had only seen him, from what I have assuming, when he went to the left-hand side" 92:18:20, 93:16-19 "I honestly thought it was three minutes, but obviously if you look at the camera and the video itself, it's about the ten minutes." 92:21-23. She admitted she saw the video from what happened the date of the incident (93:6-7) but after the date of the incident, she

gave testimony that, again, it was about three minutes that she observed the cart being abandoned. 93:9-12. While watching the video, SG could see Plaintiff trip and fall over the poles that were protruding from the cart (94:5-11) and the pipe sticking out (94:12-13). She saw Plaintiff trip and fall, but then she switched and stated, "Like I said, it's too far for her to actually see that it was the pipes. 94:14-17. Then once again, she said she saw the pipe sticking out, in the video. 94:18-19. After SG saw the customer abandon the cart and go to the shelves, she didn't put any kind of, like, cones or warning signs near the cart that had the poles protruding from it, because she "…Did not know there was any type of danger for there to me to put anything there." 95:2-7. She was asked if, to her, an abandoned cart with copper poles sticking out was not a danger or a hazard to customers and responded, "I did not see no copper pipe from where I'm stationed. So, no, I did not put that." 95:8-11. SG then admitted that she did not see the poles because she did not leave the front desk to go look to see what was in the cart, saying, "Correct, because I'm only stationed at a certain spot." 95:-12-14. She was asked if she was saying that she could not leave her spot to go make sure customers are safe and not in danger and replied, "I'm not saying I can't leave for that one specific reason" 95: 15-17. "If something was to occur, obviously I would go up to whatever situation was going on." 95:18-19. When asked what's in handouts or brochures about how to keep customers safe and protected while they're shopping and SG testified, "There's nothing specific as being -- having the customers or anything like that. It's just kind of like awareness" (98:8-12) like, if you see something, go ahead and take care of it." 98:12. On August 15th, 2019, SG saw a customer abandon his cart (98:20-22) she was trained that when you see something, you should do something. 98:23-99:1. SG saw him go buy some shelving, and then he went somewhere else." 99:7-11. She was asked again how much time passed from when he abandoned the cart until Plaintiff tripped and fell, and this time she stated,

"It was honestly like a minute or two." 102:9-11. She was asked after watching the video, how much time passed from when the customer abandoned the cart until Plaintiff tripped and fell over it and testified, "It was only seconds. So, if you go off the actual video, it was only seconds from when it actually even happened." 102:17-21, 103:4-9. She went on to state, **"Now, the whole time being there. it's ten minutes.** From what I actually thought, it was three minutes." 103:10-11. She was asked what she was talking about when she said ten minutes or more passed and stated, "Within the time frame of there being a cart there, I would say." 104:20-23.

When asked when she was a cashier, what she was taught about how to prevent accidents or incidents from happening at the store, SG said, "To obviously keep surroundings good and, I mean, well" 108:3-6. This includes making sure that shopping carts are in their proper places. 108:14-16. The protocol or the rule at Menard regarding abandoned shopping carts is, "If it's officially abandoned, we would initially take it to where it belongs." 108:21-24. The cart is officially abandoned when SG was aware that there is no one returning to it. 108:25-109-1. She stated that she would wait possibly after five or six minutes to determine that no one is coming back for the cart. 109:2-4. When asked again if she saw the cart in the video SG responded, "A portion of it. I mean, the cart, yeah, itself." 125:21-25. She claims she could not really see the pole sticking out of cart in the video. 126:1-3. When SG saw the video, she saw Plaintiff fall, but not necessarily see it being over the poles. 126:8-16. SG saw the pole sticking out of the cart. 127:2-7. SG was asked if Joint Exhibit 4A depicts how the aisle where the cat food was shelved, was similar to the date of the incident (142:23-25) and she said, "Should be, yes" (142:23-143:1) though there were no Christmas trees up in Menard's in August of 2019. 143:1-7. The photo was not taken on August 15, 2019. 143:8-10. Joint Exhibit B was not taken on the date of the incident. 143:19-25. The video could have picked up whatever was in the aisle before Plaintiff

fell, but it does not. 224:12-16. SG testified on cross that she was taught, if you see something, do something. 224:17-19. On the date of the incident, she saw a customer leave a cart unattended. 224:20-22. She also saw a video on the day of the trial that showed him leaving the cart for about 10 minutes. 224:23-25. SG said her doing something was monitoring the guest activity. 225:1-3. She paid attention and watched the cart he left (225:4-5) but did not move it until Plaintiff tripped and fell over. 225:1-8. She was shown a video at trial of a person with white shoes. 225:9-10. She couldn't see the person's body but saw white shoes. 225:10-11. The person with white shoes returned to the area around 19 minutes and 49 seconds, according to the video. 225:14-17. SG stated she was not looking down Tami's aisle, Number 9, or her lane and 225:24-25 she did not know who that individual was. 226:1-5. She would not agree that when the person wearing white shoes returned, they did not stop at the cart. 226:6-8. She claims she told him to move his cart and then Plaintiff tripped and fell. 226:9-12. SG couldn't see what was in that cart from her vantage point when she was up front. 226:16-18. Plaintiff's counsel showed SG a video at 40 seconds (227:24-25) and SG agreed that to the left of Aisle Number 9, that's the aisle she indicated that people walk back and forth. 228:1-4. **SG admitted that if the loss prevention specialist wanted to, he could have shown that aisle. 228:5-7.** When asked if the loss prevention specialist had shown us a video of that aisle, could we have seen exactly how long that cart was there, and  SG stated, "Possibly, yes." 228:11-14. She agreed that we could have seen the individual who actually left the cart. 228:16-18. She stated the video that's in front of Tami's register that was looking straight down the lane couldn't have shown us how many rails were in the cart 228:21-29:1 because, "It's too thin. Once you zoom in, it gets blurry." 229:1-4. SG agreed that neither Joint Exhibit 1A and B, showed a man abandon a cart and go to the shelf to look at product. 231:7-10. She admitted that she was not paying attention and watching the

abandoned cart the entire time (233:4-6) the other registers distracted her (233:7-8) and there were other lanes open. 233:9-10. SG is not sure how long she looked away from watching the cart (233:15-16) but while she was not watching it could have been when Plaintiff tripped and fell over it. 233:17-19. SG testified about another camera's default position in outdoor power, due to the high-theft products that people walk out with. 183:24-184:1. Guzman's attorney stated "Okay. But did we see that footage? **Did someone in that booth save that footage from that camera that day?" SG responded, " No." 184:2-4**. Plaintiff's counsel tried asking about this on redirect, which should have been permitted, but instead she was reprimanded by the court. 237:1-5.

**Kimberly Domantas, (Pl.'s Exhibit E, Trial Transcript, Vol. No. 2 PM, May 14, 2024 1:00 p.m.)**

On August 15, 2019, she was in the Menard store in Joliet (252:13-15) located at 2524 West Jefferson Street. (252:17). After she got pet food off the shelves, she went to the cashier's station to pay. (257:22- 23). Before she got to Tami, she looked to see which register she was going, which light is on because if the light is off, that means they don't want you to come to their lane. If the light is on, you can go there. (258:11-14, 258:15-16). She was looking straight ahead not down at the ground. (258:19-20). She noticed lights appear, letting her know that it was open for her to check out. (259:13-16). When she almost reached the end cap (260:1-5) her body hit the cement. She did not see it (269:20) and she felt like it was cement. It was a heavy piece of long pole… (260:23-25). KD walked into a heavy piece of long pole. (261:1). She fell and slammed her hand and her right knee on the cement ground. (261:17-18). The poles were at the end of the end cap; if you're looking forward, just looking to see what register you want to go to, you can't see anything. You can just see clearly the registers or the light that's on. (262:15-21). She told the

cashier she just wanted to go home. She did not want anyone to look at her and just wanted to pretend like nothing was wrong. (263: 16-18). She got up and it hurt like heck, and she did it anyway. She had tears coming out of her eyes and when anyone would look at her, she would just turn he head. (263:23-264:1).

Prior to the trip-and-fall Domantas had not taken any medicine that day that might affect her mobility; (266:8-11) she was not wearing slippery shoes; (266:13) she did not notice any warning signs near the rail cart where the poles were protruding; (266:14-16) there were no Menard's workers standing near the cart; (266:17-19, 269:17-20) and no one yelled be careful. (266:20-22). She had no other notice, or any other warning given to her prior to her tripping and falling over the cart (266:23-25). Domantas and Tami had a conversation while she waited about the 20-minute-or-so time. Tammy was upset with the guy that left it there. 267:17-19. She was, like, very sarcastic about it and angry. Like, "Why was it there that long? I thought he was never going to come back." No. "I thought" -- "I thought he went home and came back," (267:17-286:1). She walked away from her part of the register where she was waiting on people when she noticed him come back to his -- to his cart and said, "She got hurt on your cart." (268:6-8). He actually came up later and apologized when I was at guest services later, and I wouldn't even look at him because I was so mad at him, but he was wearing an orange shirt. (268:9-12).

On the date of the incident before Domantas tripped and fell her neck was not hurting (270:6-11). By the time she got to the hospital, which was within an hour, everything didn't just start hurting at once. (271:1-3). Her neck started hurting two days after she tripped and fell. (271:5-7). About an hour after the fall, Domantas's lower back pain was excruciating (271:8-11) she just felt like she shook her whole body up (271:10-11). It just made her hurt. She was already hurt, but she hurt a lot worse. She had shooting pains. (271:14-15). Before the incident she did

not have lower back pain (271:16-20) was not experiencing back pain (272:8-12) though she had it prior (271:21-23) just about every day (271:24-272:7). The difference in Domantas' neck pain is that after she tripped and fell, she couldn't even pick up her dog. It hurt so bad. She couldn't even take him outside and had difficulty trying to get things done. She couldn't use a can opener, everything hurt, and it was horrible. She was miserable. (274:6-11). After she tripped and fell, she would experience neck pain often (274:23-275:1) at least once a week (275:6) her pain went from mild to five or something. (275:9-14). Besides the lower back pain and the neck pain, she ended up having a fractured radial head on her elbow. The emergency room put a hard cast on it. (275:15-17). She hurt her wrist when she slammed down on the cement in Menard's, it just hurt really super bad. (275:12-23). She was in shock when she fell, humiliated. She already has anxiety, so she just wanted everybody to stop looking at her and just let her go. (276:11-13). She knew her knee was bleeding. 276:17-18. She was holding her wrist in 276:21. She had a scab on her knee 276:24. The pain was so severe in her knee that she didn't feel pain in any other part of her body that soon. (277:4-6). When asked if after she hit her knee on the cement, whether she was limping, she stated no, because even if she is hurt, she won't tell anybody else. She does not want to be that person that everybody feels sorry for. She just wants to wants to fit in with everybody else. (277:13-18).

In the emergency room, she knew she had a fractured elbow (277:19-23). She didn't even know anything was wrong with her elbow until she was driving home and she got to her driveway and tried to my steer. When she went to turn the wheel into her driveway, that's when she knew something was extremely wrong (277:23-278:3) with her arm. (278:4-5). Plaintiff wore a hard cast (279:6) that was put on in the emergency room for one to three days until a nurse took it off in Dr. Murphy's Office. (279:16-25). After it was taken off, she wore a sling for six months

(280:18-24). Domantas went to Dr. Murphy's office once a week, from August 15th until October 25, 2019. (281:13-14). He prescribed her physical therapy (281:19-20) and it was performed by another provider at Amita Health. (281:22-282:1). She had physical therapy 2-3 days per week (282:2-3) each session was approximately 1 hour (282:4-5) and she treated for seven months. (282:6-13). After she tripped and fell, she received physical therapy on the back part of her neck and maybe the bottom part of her back. (283:1-6). She recalled the doctor trying to get her to move or rotate her lower back (283:16-230) and to move or rotate her neck. (283:16-284:1). Domantas noticed a couple of times on her way home that physical therapy made her pain feel worse. (284:2-6). When asked what types of movements or manipulations made her feel worse, she responded, "Getting dressed, trying to -- trying to even button my clothes or zip or my -- when she did drive, in trying to look behind me, trying to look behind me was horrible." (284:9-11). For physical therapy Domantas rode a bicycle, stretched bands (284:16-18) was given ice and stimulation (284:19-20) and then something warm they left on for a while. (284:22-23). The hot and cold packs were wonderful, but the stretchy bands made it worse. (285:1-2, 285:20). She couldn't wait to go home. (285:11-15). When she drove away from there and just tried to look back, the pain was so bad she wanted to cry. (285:17-19). Domantas received injections from Dr. Doshi in the bottom part of her back and made about 50 trips to see doctor where one would do an x-ray every week, another doctor gave her CAT scans, and MRIs for her forearm because that was a in extreme pain. (286:5-12). After her trip-and-fall, she saw a doctor for your lower back pain (294:17-20) for her neck pain (294:21-23) for her wrist pain (294:24-295:1) and for her elbow pain (295:2-34). After she tripped and fell in Menard's, her elbow pain went from zero to ten. It hurt really, really bad. (295:9-18).

When asked if there were any types of movements she made or she could make now that

would make her elbow hurt (295:19-20) she replied, "Well, to this – To this day, it still hurts to press on it. When I press on it, there's still a tender spot in there for some reason. And if I bang it on the -- like if I just wanted to rest on here, I can. But if I hit that certain spot, then it goes right through my system. It's like, ah, like hitting a nerve, and it hurts very bad. And it happens once a day, because I'll either hit it on the side of a wall or I'll lean or forget. And like I can feel it right now. I can feel it right now just by touching it and not touching this to this." (295:21-296:1-9). Just by pushing in, she still feels a tender spot. (296:12). Nothing as far as her elbow were present before she tripped and fell in Menard's. (296:13-15). Domantas received treatment for her elbow after the slip-and-fall incident (296:16-21). She saw two orthopedic doctors and a primary doctor. (298:21-23). She received treatment for her wrist after the trip-and-fall (299:13-15). She can no longer look at her elbows the same (300:5) because the left one is bigger and fatter than this one. (300:7). "I look like I'm dilapidated." (300:8-10).  Plaintiff stood and held her elbows up for jurors to see. (300:18-19). She showed them how her left elbow looks different (300:20-301:12). She said its fatter, and it's got, like, lumps (302:7) and when she touches, she feels like maybe like liquid or something puffy. (302:11-12). Her elbows are different than before the trip-and-fall. (302:13-15).

After tripping and falling at Menard's, the pain affected her ability to perform everyday tasks or activities. She said, "From doing laundry, having a hard time doing everything with one hand, taking a shower with one hand, trying to wash my hair with one hand, and there's so many things that you don't -- that you take for granted, getting dressed, carrying groceries and opening the door at the same time kind of a thing. (311:8-19). Just like -- like basic -- like hobbies or like painting or -- I used to do that, but I don't but -- (311:20-21), She is just careful, just extra careful." I often -- more often than not I have to use my right arm to compensate for my left arm.

Like, for example, when I -- I carry all the heavy stuff or I try to carry all the heavy stuff with my right arm, and I'm so sick of doing that. And I just -- I baby this arm so much." (313:3-9). Since the incident she has experienced fears or irritability. She is scared that it's going to happen again. (313:10-13). It just hurts a little bit more to do it, you know, but there's nothing I can't do, but it just takes a little longer. It hurts a little more, but I'm fine. (313:17-20). Ms. Domantas still experiences pain in her elbow. (314:1-5).

**Defendant's Closing Argument, (Pl.'s Exhibit F, Trial Transcript, Vol. No. 3 am)**

Defense counsel told jurors, "The eyes on the ball that *I asked you to pay particular attention to are those evidencing, you know, the hard evidence, not the argument part, not the parts that can be biased or tainted or manipulated, but the hard evidence, the videos, the photos, and the medical records and bills and the testimony of the doctors. I am glad to hear that the Court's going to let you see all of that."* 494:5-12. Finally, on that hard evidence, I ask you to look at the medical issues, the damages beyond what you see in the video, because you can see -- draw some inferences from her injuries in the video. 506:1-4. Dr. Doshi is next on the hard evidence. You saw the note, and you're going to get to see the note again. You're going to get that record. 507:5-7. This plaintiff asked her doctor to lie. Now, if she's willing to ask her doctor to lie, what else does that tell you about her? That's big. 507:16-18. And then let's talk about what hard evidence you didn't see. I heard a lot of testimony from this person who asked her doctor to lie for her about all the other doctors she saw, all the other miscellaneous undescribed MRIs and CTs and PTs. Where are the medical bills? 507:19-23. We don't know. You're supposed to rely on the evidence in this case, not these aloof, yeah, it hurt; yeah, I went to this doctor; I had a lot of treatment. I'm not denying that. We know why that happened. She has degenerative spine from lumbar to -- well, actually, from cervical to lumbar through Dr.

Doshi's testimony. She also has osteoarthritis, and she has fibromyalgia. 508:7-13. This is the simple one, Verdict Form C. If you find that she didn't meet that element, you go to Verdict Form C. The plaintiff didn't prove we knew or should have known of that hazard of the pole, you go right to C. 512:12-15. So, I think the evidence is -- strongly supports that you have to use Verdict Form C for the defendant, because we're not legally responsible under Illinois law because we didn't have notice of the hazard. So, I ask you -- I thank you for your time and ask you to consider using Verdict Form C as you deliberate in the back. Thank you for your time. 513:21-514:2.

## LEGAL STANDARD

A new trial should be granted "only when the record shows that the jury's verdict resulted in a miscarriage of justice or where the verdict, on the record, cries out to be overturned or shocks [the] conscience." *Davis v. Wisconsin Dept. of Corrections,* 445 F.3d 971, 979. A new trial may be ordered when the court erred in admitting evidence such that a party's substantial rights were violated, *Naeem v. McKesson Drug Co.,* 444 F.3d 593, 608-9; when the jury was confused or misled because the jury instructions did not adequately state the law, *Susan Wakeen Doll Co., Inc. v. Ashton Drake Galleries,* 272 F.3d 441, 452; when the verdict was against the manifest weight of the evidence, *King v. Harrington,* 447 F.3d 531, 534; or when the damages awarded were "monstrously excessive" or lacking rational connection to the evidence. *Holmes v. Elgin, Joliet & Eastern Ry. Co.,* 18 F.3d 1393, 1395. In this case, none of these scenarios exists.

The law is clear that, "A jury "has wide discretion in determining damages, so long as it has a reasonable basis." *Am. Nat. Bank & Trust Co. v. Reg'l Transp. Auth.,* 125 F.3d 420, 437. "Underlying this deference to a jury's assessment of damages is the acknowledgment that the actual measure of damages is an exercise of fact finding." *Spina v. Forest Preserve Dist. of Cook*

*County,* 207 F. Supp. 2d 764, 771, citing *Cygnar v. City of Chicago*, 865 F.2d 827, 847. Therefore, the Court may not "substitute [its] view of a proper award for that returned by the jury." *Galard v. Johnson,* 504 F.2d 1198, 1202. This is true even if the record leaves this Court "with the uncomfortable feeling that the verdict is too high." *Huff v. White Motor Corp.*, 609 F.2d 286, 297. Judicial review of jury compensatory damage awards are to be limited to three questions: (1) whether the award is "monstrously excessive;" (2) whether there is no rational connection between the award and the evidence, indicating that it is merely a product of the jury's fevered imaginings or personal vendettas; and (3) whether the award is roughly comparable to awards made in similar cases. *Farfaras,* 433 F.3d at 566; *Deloughery v. City of Chicago,* 422 F.3d 611, 619.

## ARGUMENT

### A.   Domantas' Medical Records Were Appropriately Published To The Jury.

Defendant generally states, "The information contained in these records—most of which was unrelated to Domantas' accident at Menard's retail store" and now states the records "were highly prejudicial to Menard and unfairly swayed the jury in rendering its verdict." Plaintiff was the only one who was prejudiced at trial and Menard is the only party who tried to unfairly sway the jury, but its trial strategy backfired. Defendant erroneously wants this Court to vacate the jury's verdict and allow Menard a new trial, but it does not even state which parts of Plaintiff's medical records were highly prejudicial and how. The inclusion of these records was both appropriate and necessary to address the central issues and false claims against Plaintiff presented at trial. The admission of evidence is reviewed for an abuse of discretion, and a new trial should be granted only if the admission of evidence had a substantial influence on the outcome *United States v. Loughry*, 738 F.3d 166, 170.

### B.  This Court Did Not Err Because The Defendant Introduced Plaintiff's Records.

Somewhat, similar to *Coleman v. Frierson*, medical records were not introduced by the Plaintiff but rather by defendants in their cross examination. 607 F.Supp. 1566, 1576. At trial, Defendant read Dr. Doshi's Deposition transcript into the record that reference the medical records. The Defendant moved that all, not certain pages of Exhibit DXA be admitted into evidence (355:13-15, 19-2). Plaintiff did not object to them being entered into evidence. 355:22-23. The Court admitted them. 355:24 . During the course of that cross examination, large portions of the reports were read to the jury. With defendants' counsel having taken the lead in making use of the reports and having read large portions of them to the jury, defendants cannot fairly object to admission of the documents themselves... *Coleman v. Frierson*, 607 F.Supp. 1566, 1576. Defendant could have chosen a different trial strategy, but their attempt to tarnish Plaintiff's credibility backfired and the jurors were rightfully allowed to see that Plaintiff was truly injured after tripping and falling at Menard.

**C. There Was No *Unfair Prejudice* In Admitting Plaintiff's Medical Records.**

Defendant admits, "Generally, jurors are entitled to examine exhibits that are properly admitted into evidence. *United States v. Loughry*, 738 F.3d 166, 170 (7th Cir. 2013). Pursuant to Rule 901, items such as tape recordings, writings, records, and the like, must be authenticated and identified before they are admitted into evidence to ensure that the offered evidence is relevant to the issues being litigated. *Cook,* 783 F.2d 684, 688. However, it falsely stated, "The Court should not send to the jury room exhibits that neither party has relied on, that have no relevance to any of the issues central to the case, or that are cumulative, prejudicial, confusing, or misleading. *United States v. Adame*, 827 F.3d 637, 648. **(Pl.'s Ex A).** Similarly to *Cook v. Hoppin*, Defendant's argument to the contrary appear to be based upon a false assumption that all prejudicial evidence is automatically excluded under Rule 403. *Cook,*

783 F.2d 684, 689 (1986). By its very nature, however, "[r]elevant evidence is inherently prejudicial" to one side or the other involved in litigation. *United States v. McRae,* 593 F.2d 700, 707, *cert. denied,* 444 U.S. 862, 100 S.Ct. 128, 62 L.Ed.2d 83; *United States v. Medina,* 755 F.2d 1269, 1274. quoting *Cook,* 783 F.2d 684, 689. Defendant should have known that Rule 403 was never intended to exclude relevant evidence simply because it is detrimental to one party's case; rather, "the relevant inquiry is whether any *unfair prejudice* from the evidence substantially outweighs its probative value." *United States v. Hattaway,* 740 F.2d 1419, 1425 *cert. denied,* 469 U.S. 1089, 105 S.Ct. 599, 83 L.Ed.2d 708 (1984). quoting *Cook,* 783 F.2d 684, 689. It is well settled that evidence is unfairly prejudicial only if it "will induce the jury to decide the case on an improper basis, commonly an emotional one, rather than on the evidence presented...." *Medina,* 755 F.2d at 1274. *See* Advisory Committee Note to Fed.R.Evid. 403. "Evidence that appeals to the jury's sympathies, arouses its sense of horror, provokes its instinct to punish, or triggers other mainsprings of human action may cause a jury to base its decision on something other than the established propositions in the case." 1 J. Weinstein and M. Berger, *Weinstein's* Evidence ¶ 403[03], at 403–33–39. This is the type of evidence that Rule 403 excludes as being unfairly prejudicial. *See United States v. Zeuli,* 725 F.2d 813, 817 (1st Cir.1984). In this case, Defendant and its counsel's inappropriately comments about Plaintiff was an attempt to "arouses its sense of horror, provokes its instinct to punish, or triggers other mainsprings of human action." They had and still have the audacity to try to keep the jury from fact checking it by prohibiting access to all of Plaintiff's medical records, ones they introduced into the evidence. Jurors should have been allowed to see for themselves. Perhaps what Defendant thinks is prejudicial is the fact that the jurors were able to review the records during deliberations to verify if what it said in closing about the Plaintiff

was true. This type of gamesmanship should be disallowed.

**D. Plaintiff's Medical Records Should Have Been Given To The Jury Because The Parties Agreed That They Would Be Introduced At Trial In Their Pretrial Memo**

In this case, the parties agreed in their Pretrial Memo that the records would be introduced at trial. **(Pl.'s Group Ex. G, Order and Pre-Trial Memo)**. Both parties relied on the medical records, they were very relevant to the issues central to the case, and they were not cumulative. Therefore, this court did not err in allowing the entire record to go back. The defendant made reference to several pages in the medical records, but now that it did not win, it wants to claim that "Although only *one page* was relevant to this case, the Court—over Menard's objection— sent the entirety of Exhibit DXA back to the jury room during deliberations. This caused significant prejudice to Menard and unfairly swayed the course of the jury's deliberations. In the parties' Pre-Trial Memo, neither the court nor the Defendant stated that it only wanted 1 page of the entire record to be entered into evidence or be given to the jury, but not it states, "However, Exhibit DXA was only introduced for a documented interaction between Domantas and Dr. Doshi's office. (Ex. 1, p. 42)." A new trial is not appropriate because the defendant trial strategy backfired on it again.

**E. Plaintiff's Medical Records Should Have Been Shown To The Jury To Refute Defendant's False Accusations About Her Moral Character And Assessment Of Her Injuries**

Defendant's assertion that the medical records should not have been sent to the jury is undermined by their own use of these records during the trial. In its closing, Defendant, again, went for broke and argued "This plaintiff tried to get her doctor to commit fraud, tried." (Pl. Ex. E, Vol. No. 3 AM 507:8-9) and "There's no objective evidence whatsoever that her subjective complaints were ongoing or permanent in nature or no diagnostic studies, no expert testimony, no recent treatment." *Id.* 447:13-15. It made its best last effort to attempt to not just

tarnish, but bury Plaintiff, her credibility, and the validity of her injuries. It in essence it put the key in the door so that Plaintiff could not just open it but knock it down with her medical records and the truth that followed. Given this, it was entirely appropriate for the jury to review the full context of the medical records to assess these claims properly. *Malanowski v. Jabamoni*, 332 Ill. App. 3d 8, 14. These accusations made Plaintiff's entire medical history relevant to her credibility and the extent of her injuries *United States v. Adame*, 827 F.3d 637, 648; *Deicher v. City of Evansville, Wis.,* 545 F.3d 537, 542. The medical records provided a comprehensive view of Plaintiff's medical condition and were necessary to counter the defense's allegations of fraud. Plaintiff asked Dr. Doshi to correct her medical records because she did not have the facts correct including the place where Plaintiff was injured. She had a right to inform her doctor of her errors and omissions.

## I.       MENARD IS NOT ENTITLED TO A REMITTITUR

Menard is not entitled to a remittitur and ordering one for or a new trial would be improper. The determination of damages is a question reserved to the trier of fact, and a reviewing court will not lightly substitute its opinion for the judgment rendered in the trial court. See *Lau v. West Towns Bus Co.,* 16 Ill.2d 442, 452–53; *Marchese v. Vincelette,* 261 Ill.App.3d 520, 529–530. When considering a motion for remittitur, the trial court must accord proper deference to the jury's verdict. *Farfaras v. Citizens Bank and Trust of Chicago,* 433 F.3d 558, 566; *American Nat. Bank & Trust Co. of Chicago v. Regional Transp. Authority,* 125 F.3d 420, 437. That deference is consistent with and demanded by the Seventh Amendment, which places limitations on the judge's power to reexamine the jury's verdict. *See Latino v. Kaizer,* 58 F.3d 310, 314; *Cygnar v. City of Chicago,* 865 F.2d 827, 847. The substantive law of the state determines whether the damage award was adequately supported

by the evidence. *Gasperini v. Center for Humanities, Inc.,* 518 U.S. 415, 438. In Illinois, "the evidence need only to tend to show a basis for the computation of damages with a fair degree of probability." *Medcom Holding Company v. Baxter Travenol Laboratories, Inc.,* 106 F.3d 1388, 1398 quoting *In re Busse,* 124 Ill.App.3d 433. quoting *Jabat, Inc. v. Smith*, 201 F.3d 852. As 11 Wright & Miller § 2806, at 49 (footnotes omitted) puts it:

> On the one hand, the trial judge does not sit to approve miscarriages of justice. His power to set aside the verdict is supported by clear precedent at common law and, far from being a denigration or a usurpation of jury trial, has long been regarded as an integral part of trial by jury as we know it. On the other hand, a decent respect for the collective wisdom of the jury, and for the function entrusted to it in our system, certainly suggests that in most cases the judge should accept the findings of the jury, regardless of his own doubts in the matter.... If, having given full respect to the jury's findings, the judge on the entire evidence is left with the definite and firm conviction that a mistake has been committed, it is to be expected that he will grant a new trial. *Coleman v. Frierson*, 607 F.Supp. 1566, 1577

Applying that standard to a review of the evidence as a whole, this Court cannot say the jury's estimate of Domantas's damages was mistaken. The record is clear that the jury awarded Plaintiff $190,000.00 and reduced it by 40% to a $114,000,00 verdict. **(Pl. Ex B, Verdict)** to account for the apportionment of fault to the Plaintiff. No further remittitur is required. Accordingly, as with its trial strategy, Defendant did not give the jury an alternative range to award the Plaintiff nor has it given this Court any suggestions for exactly what a remittitur should be, just that it is needed. The evidence adduced at trial in fact supports such a sum of $190,000,00.

### A. The Jury Award For Plaintiff Was Not "Monstrously Excessive"

The jury ultimately awarded Plaintiff $114,000.00 not $114,000,000.00. A monstrously excessive verdict is one that is "a product of passion and prejudice." *Fleming v. Canty. of Kane,* 898 F.D.A. 553, 561. Defendant fails in its efforts to prove that these verdicts are "monstrously

excessive" or lacking in any rational basis to the evidence or not comparable to other current cases. The Seventh Circuit has emphasized that "monstrously excessive" is not a talisman, the mere invocation of which automatically resolves questions of excessiveness. Rather, it has said that it simply may be another way of asking whether there is a rational connection between the award and the evidence. *Deloughery,* 422 F.3d at 619 n. 4; *Harvey v. Office of Banks & Real Estate,* 377 F.3d 698, 713–14 (7th Cir.2004). We have observed that the "monstrously excessive" standard and the "rational connection" standard are really just two ways of describing the same inquiry: whether the jury verdict was irrational. See *Harvey v. Office of Banks & Real Estate,* 377 F.3d 698, 713–14 (7th Cir.2004); *EEOC v. AIC Sec. Investigations, Ltd.,* 55 F.3d 1276, 1285 n. 13 (7th Cir.1995).

## B.  There Was A Rational Connection Between The Award And Evidence.

In order to determine whether the jury's verdict was irrational, the district court must review the trial record as a whole in the light most favorable to the verdict. This perspective is essential, if we are to preserve the jury's role as the trier of fact. Quoting *Adams v. City of Chicago*, 798 F.3d 539, 543. An award of damages will be deemed excessive if it falls outside the range of fair and reasonable compensation or results from passion or prejudice, or if it is so large that it shocks the judicial conscience. *Richter v. Northwestern Memorial Hospital,* 177 Ill.App.3d 247, 257, 126 Ill.Dec. 584, 532 N.E.2d 269. As Judge Kennelly noted in *Deloughery v. City of Chicago,* 2004 U.S.Dist. Lexis 9102, (02 C 2722) (N.D. Ill. 2004):

> "If we are to remain faithful to the Founders' vision, which includes submitting civil disputes to citizen juries, and if damages for physical and emotional pain and suffering are to be available, we must be willing to accept variations in how juries will assess those damages in different cases....Further, the description of evidence found in reported district and appellate court decisions typically does not permit a realistic determination of whether the case is truly comparable to the one being evaluated." *Id.* at 13.

The plaintiffs' testimony sufficiently supports the jury's verdict plaintiffs may prove emotional injuries without medical evidence. *Deloughery v. City of Chicago*, 422 F.3d 611, 619–20 (7th Cir. 2005). After all, "'[t]he state of a man's mind is as much a fact as the state of his digestion. It is true that it is very difficult to prove ..., but if it can be ascertained it is as much a fact as anything else.'" *O'Sullivan v. City of Chicago,* 474 F. Supp. 2d 971, 974, n. 3 citing *Arave v. Creech,* 507 U.S. 463, 473 (1993). In *Waits v. City of Chicago*, the court explained, "[t]he jury was presented with evidence, in the form of plaintiff's own testimony, regarding his physical pain and suffering following the arrest and they were therefore permitted to make the rational connection that defendants' tortious conduct caused plaintiff's injuries." No. 01 C 4010, 2003 WL 2130277, at 3 (N.D. Ill. June 6, 2003). The major facts that Plaintiff presented at trial are Fact Section of this memorandum, pages 2-7.

### C. The Award Is Roughly Comparable To Awards Made In Similar Cases

At trial the Defendant decided to go for broke and never offered the jury any options on a verdict range. (Pl. Ex. C, Volume No. 3 AM 508:7-13, 512:12-15), and 513:21-514:2. Its strategy was simply to argue that it was not responsible for its negligence, but this trial strategy also failed. As the Seventh Circuit noted in *Avitia v. Metropolitan Club of Chicago, Inc.,* 49 F. 3d 1219, 1230: "When a defendant goes for broke, staking its all on convincing the jury to award zero damages fearing otherwise a compromise verdict it risks being hit with a verdict much larger than if it had offered the jury an alternative estimate of damages to the plaintiffs. It should not expect the appellate court to relieve it from the consequences of its gamble." Nor should this Defendant now expect this Court to relieve it of its errors. It is well settled that, "[T]he law does not require that the plaintiff prove the amount of her losses with mathematical precision, but only with as much definiteness and accuracy as circumstances

permit." *Williams* at 1469. Further, despite the defendant's apparent assertion, "[T]he law does not require that the plaintiff prove the amount of her losses with mathematical precision, but only with as much definiteness and accuracy as circumstances permit." *Williams* at 1469. Every case is different, and the damages awarded by juries are awarded on the basis of individualized facts and the jurors' assessment of those facts. Courts in this state, however, have traditionally declined to make such comparisons in determining whether a particular award is excessive see *Tierney v. Community Memorial General Hospital,* 268 Ill.App.3d 1050, 1065; *Northern Trust Co. v. County of Cook,* 135 Ill.App.3d 329, 335, and we do not believe that such comparisons would be helpful here. Quoting *Richardson v. Chapman*, 175 Ill.2d 98, 114.

In *Farfaras* the court held, Our responsibility, however, is not to fit this case into a perfect continuum of past harms and past awards. Rather, our role in reviewing awards for abuse of discretion is to determine if the award in this case was roughly comparable to similar cases, such that the instant award was not so beyond the pale as to constitute an abuse of discretion. *Farfaras v. Citizens Bank and Trust of Chicago*, 433 F.3d 558, 566–67 (7th Cir. 2006). In E.g., E.*E.O.C. v. AIC Security Investigations, Ltd*., 55 F.3d 1276, 1286 (7th Cir. 1995) the court held, "[I]t may be that [the plaintiff] did not really deserve as much as [he got], but that is not the question. The question is whether that award was grossly excessive, and it was not." There are numerous comparable jury verdicts in this circuit for trip and fall and slip and fall cases as follows. In *Juan Trevino v AMB Financial Corps*,. *D/B/A American Savings FSB*, 2012 WL 3792835, the verdict was for Plaintiff for $177,000.00. It was reduced it to $159,300.00 per fault apportionment in a trip and fall case. In *Robert Knaus v Schunck Markets,* IV SWIL 4-9, 1995 WL 17008095, a slip and fall case in a store, where the verdict was for Plaintiff for $150,000.00. In *Madelaine Weil v Walmart*, 1995 WL 17008145, a slip and fall case, the

verdict was for the Plaintiff for $125,0000.00. The jury reduced it to apportion 35% fault to Plaintiff, with a final net of $81,250.00. In *Caroline Smith v J.H. Findor & Son,* 2012 WL 7811637, a trip and fall case, the verdict was for the Plaintiff for $150,000.00 ($48,993.31 to Plaintiff, $48,99.31 to UW Madison, and $52,013.38 to Plaintiff attorney for fees and costs). In this case, $114,000.00 is not grossly excessive.

## V. CONCLUSION

For the reasons stated above, the Defendant's arguments should be rejected by the Court and the jury verdicts should be honored. The defendant is neither entitled to a remittitur nor new trial. Menard wanted this trial and it got exactly that: a fair, comprehensive and thorough vetting of the evidence and fair and thorough and comprehensive judicial considerations of all the points it now makes. The jury has spoken and simply because the Menard does not now like what it said, does not give it the right to start over. The defendant took its best shot, lost, and now needs to live with the consequences of its own actions.

Dated: July 29, 2024,                                  Respectfully submitted,

                                                       /s/ Danielle A. Pinkston
                                                       _____
                                                       Danielle A. Pinkston
                                                       Pinkston Law Group, P.C.
                                                       54 N. Ottawa St., Ste. #110
                                                       Joliet, IL 60432
                                                       Office: (773) 770-4771
                                                       dpinkston@pinkstonlawgroup.com
                                                       Atty. for: Plaintiff