# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| **KIMBERLY DOMANTAS,** | ) | |
| | ) | **No. 21 C 232** |
| **Plaintiff,** | ) | |
| | ) | **Magistrate Judge Gabriel A. Fuentes** |
| **v.** | ) | |
| | ) | |
| **MENARD, INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

On August 15, 2019, Plaintiff Kimberly Domantas was shopping for pet food at Defendant Menard Inc.'s ("Menard") store in Joliet, Ill., when she tripped over a pole that protruded from the bottom of a shopping cart that was sitting at the end of an aisle.  Plaintiff injured her elbow in the fall and later sued Menard under a theory of premises liability. (D.E. 1: Complaint.) During the subsequent jury trial, at the close of Plaintiff's case, Defendant orally moved under Rule 50(a) for judgment as a matter of law, which the Court denied. (D.E. 140.)  At the end of the trial, the jury found for Plaintiff and awarded her $190,000 in damages, which it then reduced by 40 percent to $114,000 to account for Plaintiff's contributory negligence. (D.E. 146.) Defendant now has moved for judgment notwithstanding the verdict pursuant to Federal Rule of Civil Procedure 50(b), arguing that even taking all facts and inferences in the light most favorable to Plaintiff, there is no evidence that Defendant had either actual or constructive knowledge of the "long skinny pole that was sticking out of a customer's cart that was located at the endcap of the aisle Plaintiff was walking down." (Def. Renewed Mot. for Judgment as a Matter of Law ("Mot."); D.E. 148 at 1-2.) Plaintiff filed a response, ("Pl. Resp."; D.E. 160), and Defendant replied ("Def. Reply"; D.E. 168). After reviewing the evidence from trial and the parties' arguments, the Court's decision follows.

## I.     Legal Standard Under Rules 50(a) and (b)

Rule 50 allows a district court to enter judgment against a party who has been heard fully on an issue during a jury trial if "a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." Fed. R. Civ. P. 50(a) (motion for judgment as a matter of law); Fed. R. Civ. P. 50(b) (renewed motion for judgment as a matter of law). On a renewed motion under Rule 50(b) for judgment as a matter of law, a court is "limited to deciding only whether the evidence presented at trial, with all the reasonable inferences drawn there from, is sufficient to support the verdict when viewed in the light most favorable to the [nonmoving party]." *Hasham v. California State Bd. of Equalization*, 200 F.3d 1035, 1043 (7th Cir. 2000) (internal quotation marks and citation omitted); *see also Passananti v. Cook County*, 689 F.3d 655, 659 (7th Cir. 2012) ("In deciding a Rule 50 motion, the court construes the evidence strictly in favor of the party who prevailed before the jury and examines the evidence only to determine whether the jury's verdict could reasonably be based on that evidence."). After reviewing all the evidence in the record, a court must disregard all evidence favorable to the moving party that the jury was not required to believe. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151 (2000). A jury verdict will be overturned only if the court concludes that "no rational jury could have found for the plaintiff." *Hasham*, 200 F.3d at 1043 (citation omitted).

## II.    Facts Relevant to Defendant's Motion

Defendant's sole argument is that there is no evidence that it had either actual or constructive knowledge of the "long skinny pole that was sticking out of a customer's cart that was located at the endcap of the aisle Plaintiff was walking down," and thus, that no rational jury could have found for the Plaintiff. (Mot. at 1-2.)  Because the Plaintiff prevailed on the question of liability, we recount the facts in the light most favorable to the jury's verdict. *See, e.g., Dean v.*

*Wexford Health Sources, Inc.,* 18 F.4th 214, 222 (7th Cir. 2021). The Court will recount only those facts relevant to its decision; for example, evidence adduced at trial about Plaintiff's injuries is omitted here.

### A.    Plaintiff's Accident Inside the Menard Store

August 15, 2019, was the day the pet food went flying at the Menard store in Joliet. *Domantas v. Menard, Inc.*, No. 21 C 232, 2022 WL 204374, at *1 (N.D. Ill. Jan. 24, 2022). Plaintiff visited the Menard store to use an $8.00 "rebate check" to buy pet food. (5/14/24 Tr. at 252, 253.)[1]  She did not use a cart or basket to hold the food but stacked the 12 cans on top of each other and carried them by hand. (*Id.* at 254-55.)  From the pet food aisle, Plaintiff walked straight to the checkout area to pay, looking at the various cashiers' lanes to see which ones had their light on, indicating they were open. (*Id.* at 257-59.)  Before entering one of the cashiers' lanes, Plaintiff testified that she walked into a "heavy piece of long pole," which hit her leg a few inches below her knee, causing her to fall to the ground and drop the cans of pet food she was carrying.[2] (*Id.* at 260-61.)  Plaintiff testified that the pole was protruding diagonally from the end of a shopping cart, describing it as "leaning over like . . . the bottom of this skinny super long pole was going from this end of the cart, and it was low over here were I tripped over . . . [o]n an angle like." (*Id.* at 262-63.)  She did not see the pole protruding from the cart before tripping over it. (*Id.*) Plaintiff

---

[1] The trial transcript appears in the record at D.E. 152, 153, 154, and 155.  This Order will refer to the transcript by the date of the testimony and the transcript page number from these four docket entries, i.e., "5/14/24 Tr. at ___." With respect to the two separate parts of the transcript from 5/14/24, docket entry 155 covers pp. 115-248 and docket entry 153 covers pp. 249-426.

[2] Plaintiff testified several times that she tripped over a "pole," singular.  (5/14/24 Tr. at 260, 262.) Plaintiff's attorney consistently referred to "poles," plural, but there is no evidence that Plaintiff tripped over more than one pole. At times, the parties also refer to the items as "pipe(s)" or "copper pipe," but no evidence was adduced at trial conclusively identifying exactly what kind of "pole" or "pipe" Plaintiff tripped over. Nevertheless, there is no dispute that Plaintiff tripped over some sort of solid, long, skinny "pole" or "pipe" that protruded diagonally from the bottom of the rail cart.  If the Court uses the plural word "pipes" or "poles" in describing evidence or testimony, it is because Plaintiff's attorney used the plural to ask a question, and the witness answered without correcting her.

3

also testified the cart was located at an "endcap" to her right as she walked down the "center aisle" near the checkout lane she was approaching; that lane was staffed by Menard cashier Tami House. (*Id.* at 260.)

At this point, the Court must point out that during the trial, both parties presented their cases under the premise that at the time Plaintiff tripped over the pole sticking out from the cart, the cart had been left at the endcap by another customer. That is, the parties do not allege that either the cart or the pole in the cart was placed there by a Menard employee. As will be described in further detail below, a major issue determining the outcome of this motion concerns how long the cart and pole sat near the endcap before Plaintiff's fall and whether, when, and how many times the other customer may have returned to the cart before Plaintiff's fall. Plaintiff's attorney referred to the cart as "abandoned" on several occasions (5/13/24 Tr. at 79, 80, 81, 102), a characterization to which Defendant did not object, although no witness used that precise word.[3] Both parties also adduced evidence that ultimately, the cart was not abandoned, and Plaintiff testified that at some time after her fall, the other customer apologized to her and then took the cart and pole to a checkout lane to pay for it. (5/14/24 Tr. at 170, 207, 217; JX1 B, JX1 C.)

At the time of the incident, Tami House was working as a front-end cashier. (5/13/24 Tr. at 15.) She did not witness Plaintiff tripping and falling but heard the sound of her dropping cans of pet food. (*Id.* at 28-29.) Ms. House assisted Plaintiff after her fall, helping her pick up the cans of food she had dropped. (*Id.*) Before Plaintiff's fall, Ms. House did not see the cart or the pole, testifying that all she heard were some "cans or loud noise at the . . . something falling at the end of my aisle." (*Id.* at 29.) She further testified that "[t]here was a cart there when we were standing

---

[3] Menard head cashier Sandra Guzman referred to the cart as "an unattended." (5/13/24 Tr. at 79.)

there picking things up but I . . . really didn't notice anything about the cart in particular."[4] (*Id.* at 34.)  She did not see the pole protruding from the cart while helping Plaintiff pick up her pet food. (*Id.* at 35.)

According to Plaintiff, when she spoke with Ms. House after she fell, Ms. House "was upset" and "very sarcastic and angry" about the customer who left his cart in the aisle and commented that she thought the customer "was never going to come back." (5/14/24 Tr. at 267.)

Menard employee Sandra Guzman was working as head cashier on the day of the incident. (5/13/24 Tr. at 75.)  Before Plaintiff's fall, she saw the very top part of the rail cart from her position at the front of the registers but could not see the bottom part because it was behind a register door closing off a checkout aisle that was not in service. (*Id.* at 77-78.)  When she saw the cart in person, she did not know how long it had been at the endcap or when the customer had left it.  (*Id.* at 78, 79; 5/14/24 Tr. at 240.)  After she saw the top part of the rail cart sitting alone, Ms. Guzman monitored the cart and the activity of the guest who had left the cart. (5/14/24 Tr. at 224, 225.)

At one point prior to Plaintiff's fall, Ms. Guzman saw the customer walk away from the cart and walk to the left, near "shelving," at which point she knew the cart was "an unattended." (5/13/24 Tr. at 79, 81.)  Ms. Guzman testified that she did not leave her station to go check the cart because she did not think "there would be any danger for it being to my guests or my friends as team members." (*Id.* at 80.)  She testified that she did not know for certain that there were no hazards associated with the cart, but if she had thought there was anything dangerous, she would

---

[4] Ms. House testified that Menard had four different types of carts for customers to use: smaller grocery carts for older guests, large grocery carts, plywood flatbeds, and "two types of rail carts." (5/13/24 Tr. at 23.) The parties agree that type of cart involved in Plaintiff's incident was a rail cart. (5/14/24 Tr. at 202; JX 6K.)

have gone to check it out. (*Id.*)  Ms. Guzman did not see the pole from her station. (*Id.* at 95.)  She did not witness Plaintiff tripping or falling. (*Id.* at 94-95.)

### B.    Video Evidence

In describing the facts in the light most favorable to Plaintiff, it is important to note several issues that arose concerning the use of video evidence and testimony by witnesses about that video, which was shown to the jury.  The final pretrial order identified joint exhibit 1 ("JX1") as "security camera footage (4 cameras)" (D.E. 136), and thus at the start of trial, the Court was under the impression that there was a single piece of video footage.  As trial progressed, it became apparent that there were four separate pieces of video footage from three different cameras: JX1 A (over lane, four minutes), JX1 B (over lane, 12 minutes), JX1 C (RPZ,[5] 16 minutes) and JX1 D (outside, 7 minutes).

In presenting JX1 A-D, the parties did *not* use any of the security camera footage as evidence to prove that that Plaintiff tripped over a pole sticking out of the bottom of a rail cart; in fact, the parties agree that Plaintiff tripped over such a pole.  Moreover, none of the four pieces of video footage shows Plaintiff tripping over a pole, although footage in JX1 B depicts Plaintiff "falling into" the camera frame and cans of pet food rolling around on the floor.[6]  Instead, the parties used the security camera footage for two issues: (1) to determine how long the rail cart sat unattended before Plaintiff's fall (and whether the customer returned to it at any time prior to

---

[5] Although no party adduced evidence about what "RPZ" means, the Court notes that Ms. Guzman testified that the RPZ camera could be rotated by an individual sitting in the security booth and that it was in fact rotated after Plaintiff fell to capture video footage that showed the aftermath of the incident.   The Court speculates that RPZ stands for "Rotate Pan Zoom."

[6] Plaintiff's attorney asked Ms. Guzman on several occasions if she remembered the video showing Plaintiff tripping over a pole (or poles) and falling; each time Ms. Guzman testified that she remembered seeing Plaintiff fall in the video but that it was too far away to see that she tripped over a pole(s). (5/13/24 Tr. at 94; 5/14/24 Tr. at 126.)

Plaintiff's fall), and (2) as evidence of Plaintiff's demeanor and injuries after the fall. Only the first issue bears on Defendant's Rule 50(b) motion.

For the purposes of this motion, the Court credits Plaintiff's contention that security camera footage established that the cart with a pole protruding from the bottom sat alone at an endcap for as long as 10 minutes before Plaintiff tripped over the pole and fell. (Pl. Resp. at 15.) Defendant agrees to this contention for the purposes of this motion. (Def. Reply at 3.) Although Ms. Guzman acknowledged that, based on security camera footage she saw later, the cart sat at the endcap for 10 minutes before Plaintiff's fall (5/13/24 Tr. at 92), no evidence presented at trial – video or otherwise – established how long Ms. Guzman personally saw the cart sitting alone at the endcap prior to Plaintiff's fall, and no evidence established that Ms. Guzman considered the cart "officially abandoned," to use her phrasing. (*See id.* at 108-09.) Plaintiff testified that at some time after her fall, the customer apologized to her and took the cart with the pole to a checkout lane to pay for it, and Plaintiff also points to evidence that the customer returned to the cart by stating in her brief that, according to security footage, "[t]he cart was there for at least 10 minutes according to the videos that were shown to the jurors with the man with the white shoes walking back and forth." (Pl. Resp. at 15.)[7]

Nevertheless, Plaintiff asks the Court to infer that the jury found in her favor because it believed Plaintiff's testimony over that of Ms. Guzman, based on supposed contradictions in Ms. Guzman's answers to questions about what she saw or remembered seeing at different times on

---

[7] "The man with the white shoes walking back and forth" refers to video evidence that an individual wearing white hi-top gym shoes walked up to and then away from the unattended cart at least one time prior to Plaintiff's fall – only the shoes and not any other part of the individual is visible in the video. In a different video, a man wearing these same white shoes can be seen pushing a rail cart holding a long pole out of the store after paying for it. (JX1 B, JX1 C.) Defendant pointed out the white gym shoes to the jury to establish that a customer returned to the cart prior to Plaintiff's fall. However, for the purposes of this motion, Defendant accepts that the cart holding the pole over which Plaintiff tripped sat alone at the endcap for up to 10 full minutes before her fall.

the videos concerning how long the cart with the pole was left unattended by another customer. (Pl. Resp. at 17-18.)[8]

Specifically, during questioning by Plaintiff's attorney during Plaintiff's case-in-chief, Menard head cashier Sandra Guzman testified that she viewed certain, unspecified security camera footage on various occasions before trial, including footage she viewed on the day of the incident and then again "five or less" times later, most recently in the week before trial, that time with Defendant's attorney. (5/13/24 Tr. at 88.) Plaintiff's attorney questioned Ms. Guzman at length about what she remembered seeing on security camera footage, without specifying which of Ms. Guzman's multiple viewings of video footage was the subject of her questions. Drawing all reasonable inferences in favor of the Plaintiff and based on Plaintiff's response brief, the Court presumes these questions were designed both to establish how long the rail cart sat alone before Plaintiff tripped and fell (and for what period of time Menard might have had actual or constructive notice of it), and also to suggest that Ms. Guzman changed her testimony or was otherwise untruthful about what she remembered seeing on the videos concerning how long the cart with the pole was left unattended by another customer before Plaintiff tripped and fell.[9] There is no dispute that when Plaintiff tripped and fell over the pole, Guzman did not see it happen. (*Id.* at 94, 95.) Moreover, as explained above, the Court finds, and Defendant agreed for the purpose of its motion,

---

[8] Plaintiff does not explain what parts of Ms. Guzman's testimony were inconsistent with anything Ms. Domantas testified.

[9] Plaintiff says in her response brief that the jury must have believed Ms. Guzman was lying because she testified that she "saw the customer who abandoned the cart, but then did not see him the entire time, change (sic) the time the cart was there until Plaintiff fell more than three times, as well as testified that she saw a video that show (sic) Plaintiff fall and what she fell over." (Pl. Resp. at 18). The Court infers that Plaintiff is not alleging that she fell three times, but that Ms. Guzman changed the length of time she thought video evidence showed the cart sitting alone three times.

that security camera footage in JX 1 B establishes that the cart and pole sat alone at the end of the endcap for as long as 10 minutes before Plaintiff's fall. (Def. Reply at 3.)

After carefully reviewing the transcript of the trial, the Court declines to make any inferences that the jury could have found that Ms. Guzman was lying about any fact critical to the question of Menard's constructive knowledge of the cart and pole. At most, Ms. Guzman's testimony showed that she was sometimes confused by Plaintiff's attorney's questions about what she saw on the security footage because the questions did not specify whether they related to Ms. Guzman's perceptions at the time she first saw the footage on the day of the incident, or what she thought the footage showed on subsequent viewings, or even if she was being asked about her personal observations versus what the video showed. On several occasions, the Court had to instruct Plaintiff's attorney to make it clear whether she was asking Ms. Guzman to testify about her personal observation the day of the incident or what she remembered from viewing security camera footage some time later. (5/13/24 Tr. at 100, 101.)

For example, upon questioning from Plaintiff's attorney about what Ms. Guzman remembered from the video about how long it took for "this man to abandon his cart, go to the shelving, and then return to the cart," Ms. Guzman answered: "I don't remember, to be honest, not off the video. I mean, from what I had recalled, I thought it was initially three minutes. Video-wise, I'm not too sure." (*Id.* at 92.) The next colloquy highlights the confusion created by Plaintiff's attorney's questioning in response to Ms. Guzman testifying that she had initially thought the video showed a man abandoning his cart for three minutes:

Q: When you saw the video, was it three minutes or was it over ten minutes?[10]

---

[10] At the time Plaintiff's attorney Ms. Guzman about a 10-minute video, she had not shown Ms. Guzman any video evidence or identified or offered into evidence any video footage at all, let alone an exhibit of a video that was ten minutes long. Plaintiff's attorney's question was the first time the topic of a "ten minute video" was raised.

A: Not over ten minutes for sure. I don't recall it being ten minutes.

Q: If you saw the video, why would you say it was three minutes when it was longer than three minutes?

A: Because I had initially thought it was three minutes. I had only seen him, from what I have assuming (sic), when he went to the left-hand side. I honestly thought it was three minutes, but obviously if you look at the camera and the video itself it's about ten minutes.

(*Id.*)

Ms. Guzman's testimony remained consistent when Plaintiff's attorney questioned her on the same issue a second time, explaining that there was a difference between what she originally thought the video showed about the length of time the man left his cart alone, what she knew as of the day of the trial what the video showed about the entire time the cart sat at the endcap alone, and what the video showed about how much time passed between the man returning to his cart, leaving again, and then Plaintiff tripping over the pole. Specifically, Ms. Guzman testified "in the actual video you can actually see it was within seconds that he . . . left and she went. Now, the whole time being there cart (sic), it's ten minutes. From what I actually thought, it was three minutes." (*Id.* at 102.)

Even making all inferences and construing all facts in favor of Plaintiff, nothing in Ms. Guzman's testimony suggests that she was being untruthful when she testified that: (1) the first time she saw the video, she thought the cart stood alone for three minutes, (2) only after watching the video again did she realize that the video shows the cart alone for 10 minutes, and (3) the video appeared to show, to Ms. Guzman, that the amount of time that elapsed between when the man temporarily returned to the cart and then left again before Plaintiff fell was only seconds. (*Id.* at 99, 100.)[11]

---

[11] Earlier in the case, the Court denied Menard's summary judgment motion in large part because Ms. Guzman's deposition testimony was not clear enough to establish the absence of a genuine issue of material

Moreover, as trial progressed, certain of Plaintiff's counsel's questions strayed toward the speculative premise that Menard had withheld or erased some video footage of the incident and/or had purposefully not moved one of the security cameras to a location that would have captured Plaintiff tripping and falling. (*See* Pl. Resp. at 9; 5/14/24 Tr. at 154 (admonishing Plaintiff's counsel in sidebar not to tell the jury that video was missing)). Even taking all evidence and drawing all inferences in the light most favorable to Plaintiff, there is no evidence to support Plaintiff's speculation that Menard purposefully withheld, erased, or did not record security camera footage of the incident. At most, Ms. Guzman testified only that the loss prevention specialist who manned the security booth "could" have panned the camera to show the aisle where Plaintiff eventually tripped and "could" have shown how long the cart sat in the aisle and the customer who left the cart. (5/14/24 Tr. at 228.) This speculation does not establish any wrongdoing by Menard or otherwise support Plaintiff's argument that it had constructive notice about the pole sticking out from the cart prior to Plaintiff's fall.

### C. Menard Policy

With respect to Menard's policy regarding shopping carts, Ms. House testified she did not know if Menard had a written policy with respect to the placement of carts in the store or if there was a protocol for handling carts that are not in use. (5/13/24 Tr. at 37.) When talking about getting "random things" including shopping carts out of the aisles, Ms. House testified that if there were "random carts or grocery carts around they would be moved; or normally, the manager or the head front cashier would go and pick things up or move things." (*Id.* at 18.) When asked why she would

---

fact as to how long Ms. Guzman, and thus Menard, knew about the cart with the protruding poles being at the end of the store aisle. *Domantas*, 2022 WL 204374, at *5-7. Plaintiff's burden at trial was higher than at summary judgment. On review of the jury's liability verdict at trial, the Court is examining whether the evidence that came in at trial – and without considerably more (or arguably even less) clarity than the evidence from Ms. Guzman that had come in during discovery – was sufficient to allow a rational trier of fact to return a liability verdict.

let someone know if there was a cart near the endcap of an aisle or a register, she testified that it would be an "obstacle" to customers trying to get in and out of the space where she was working, and in answer to Plaintiff's attorney's question about what might be a "danger" associated with leaving a cart near the endcap to an aisle or by the entrance to a register or lane, Ms. House testified that it would be that the checkout aisles are exit lanes, and a cart left in one of those places would be "something blocking those exit lanes." (*Id.* at 19-20.)

Menard never gave Ms. House any instructions or otherwise trained her about a specific time frame for fixing any safety hazards. (*Id.* at 47.)  She testified that that she used "common sense" when it came to being responsible for safety at Menard (*Id.*). She had never heard of a customer tripping and falling over a flatbed, rail cart, or shopping cart at Menard, and the only incident she knew of a customer tripping over an object in a cart was the one involving Plaintiff. (*Id.* at 23-24.)

With respect to returning carts to where they belonged, Ms. Guzman testified that her job description as head cashier did not include that task. (5/13/24 Tr. at 76.)  She further explained that this responsibility fell upon "whomever would be around within the area. So if there was a cart left behind, yes, I would – it would be whoever was there." (*Id.* at 77.)  She testified that if a cart was "officially abandoned we would initially take it where it belongs" (*id.* at 108), and that a cart is officially abandoned "when I'm aware that there is no one is returning to the cart," possibly after five or six minutes. (*Id.* at 109.)  She further testified that customers walk away from their carts "numerous times," and Menard employees do not immediately put away goods sitting in unattended carts because the customers would be "very" upset. (5/14/24 Tr. at 171.)  Ms. Guzman did not know of any other incidents of customers tripping or falling over things in the store. (5/13/24 Tr. at 107.)

### III. Analysis

Defendant argues that it should prevail under Rule 50(b) because there was no evidence at trial to support the jury's finding that Menard was constructively aware of the existence of the pole that was sticking out from the bottom of another customer's cart and that caused Plaintiff to trip and fall.

### A. Premises Liability Law

Under Illinois law, property owners owe their invitees a duty to maintain the premises in a reasonably safe condition. *Parker v. Four Seasons Hotels, Ltd.*, 845 F.3d 807, 811 (7th Cir. 2017). To prevail in a premises liability action, a plaintiff must show (1) the existence of a condition that presents an unreasonable risk of harm; (2) defendant knew, or should have known, that the condition posed an unreasonable risk of harm; (3) the defendant should have anticipated that individuals on the premises would fail to discover or recognize the danger; (4) a negligent act or omission on the part of the defendant; (5) injury suffered by plaintiff; and (6) that the condition of the property was a proximate cause of the injury to plaintiff. *Id.* If a landowner, here Menard, did not have actual or constructive knowledge of the dangerous or defective condition that caused Plaintiff's injury, there is no premises liability. *Hanna v. Creative Designers, Inc.*, 2016 IL App (1st) 143727 ¶ 34; *Tomczak v. Planetsphere, Inc.*, 315 Ill. App. 3d 1033, 1038 (1st Dist. 2000).

### B. Defendant Did Not Have Constructive Knowledge of a Hazard Prior to Plaintiff's Fall.

Although Defendant narrowly views the case to whether Menard had constructive knowledge of the existence of the pole only, the issue is not quite so black and white. The pole over which Plaintiff tripped protruded from the bottom of one of Menard's rail carts, and thus, the question of whether Menard should have known about the hazard posed by the pole turns on what it knew – and for how long – about the cart that held the pole. After considering the evidence in

13

the light most favorable to Plaintiff, the Court finds that the trial included insufficient evidence to allow a rational or reasonable jury to conclude that Menard had constructive knowledge of the hazard created by the pole sticking out of the bottom of the rail cart.

### 1. The Rail Cart By Itself Was Not a Hazard.

First, the rail cart by itself, even sitting alone at an endcap for 10 minutes, was not a hazard. Although Plaintiff argues in her brief that the "presence of an abandoned cart near the checkout lane, where most customers must pass by to check out, is a hazard in itself" (Pl. Resp. at 15), her contention is mere conclusion; she offers no legal authority nor factual evidence to support it. From a factual standpoint, even taking the facts in the light most favorable to Plaintiff, at most the evidence showed that Ms. Guzman saw the top of the rail cart from her station and did not perceive it to represent any danger or safety hazard to Menard's customers or team members.[12] Plaintiff adduced no evidence that Menard had an official policy or procedure with respect to abandoned, unattended, or out-of-place shopping carts or that any such procedure was violated by Ms. Guzman not leaving her station to inspect the cart. Moreover, Plaintiff adduced no evidence regarding how long Ms. Guzman personally observed the rail cart standing alone prior to Plaintiff's fall.

Plaintiff also suggests that Ms. Guzman was "willfully ignorant" of the hazard associated with the abandoned shopping cart by failing to leave her station to inspect it. Again, she offers no legal authority to support her contention, nor any factual evidence indicating that the cart alone was a hazard. The cases Plaintiff cites, two nearly 30-year-old decisions from the Ninth Circuit,

---

[12] Plaintiff also appears to suggest that Defendant had actual or constructive knowledge of the hazards associated with abandoned shopping carts based on Plaintiff's testimony that Ms. House was upset with the customer who left his cart at the endcap. Even taking these facts in the light most favorable to the Plaintiff, they offer nothing more than Ms. House's apparent frustration with the customer for leaving his cart in a place that caused Plaintiff to trip over an item protruding from it. Ms. House's statements do not establish that Menard had knowledge that abandoned carts in general constituted safety hazards. If anything, the evidence establishes that the cart and pole Plaintiff tripped over were not "abandoned" but had only been left "unattended" by the customer while he shopped elsewhere in the store.

*United States v. Fulbright,* 105 F.3d 443, 447 (9th Cir. 1997), and *United States v. Sanchez-RoblePlais,* 927 F.2d 1070, 1073 (9th Cir. 1991), describe the legal standard for willful blindness as "one who took deliberate actions to avoid confirming suspicions of criminality." (Pl. Resp. at 15.) Plaintiff states without any authority that the same standards should apply in this civil case, but the Court can find no basis for applying those standards to these facts or for finding that even if those standards did apply, Menard was willfully blind to the hazard of the protruding pole in this case. Factually, the evidence shows that while Ms. Guzman was aware of the cart, she specifically did not perceive any danger or hazard from it, and even drawing all inferences in Plaintiff's favor, the Court is unable to make the leap to find that Guzman purposefully (or even negligently) ignored a known or suspected hazard when she did not leave her station to go check the cart. The only evidence presented at trial concerning customers tripping over shopping carts at Menard was Tami House's and Sandra Guzman's testimony that they did not know of any such incidences.

Plaintiff also has not offered any evidence to support her suggestion that Menard, through Ms. Guzman, had any duty to inspect an unattended – or even abandoned – cart that she did not perceive as a safety hazard. As Plaintiff acknowledges, Ms. Guzman periodically monitored the cart while she was working and although she agreed that she did not know "for certain" that there were no dangers or hazards associated with the cart, she did not see or perceive any danger to guests or team members because of the cart sitting alone. Ms. Guzman testified that customers regularly left carts alone while they were shopping and that if employees rushed to put away goods in unattended carts, customers would get very upset.

*Rosales v. Menard, Inc.,* No. 17 C 1131, 2018 WL 2299232 (N.D. Ill. May 21, 2018), is instructive here. In *Rosales,* a customer tripped and fell over a piece of lumber protruding from the bottom of an unattended shopping cart. At the time the customer tripped and fell, the plaintiff

customer did not know how long the cart had been in the aisle or who put it there. *Id.* at *1. No one who worked at Menard had seen the cart with the lumber protruding from the bottom prior to the customer's fall. *Id.* at *2. Importantly, in *Rosales*, there was evidence that Menard actually knew that customers regularly transported lumber in shopping carts that were not big enough to hold the wood without it protruding from the ends. *Id.* at *3. The Plaintiff in *Rosales* argued that by having a policy that allowed customers to transport lumber in shopping carts, Menard should be charged with knowledge of any tripping hazard in its stores resulting from customers transporting lumber on the too-small carts. *Id.*

But the *Rosales* court granted summary judgment for Menard on that plaintiff's premises liability and negligence claims, finding that Illinois law did not require a heightened standard of "continuous monitoring and patrolling of a store's safety conditions that [the Seventh Circuit] and Illinois courts have summarily rejected." *Id.*, citing *Zuppardi v. Wal-Mart Stores, Inc.*, 770 F.3d 644, 649–50 (7th Cir. 2014). *See also Peterson v. Wal-Mart Stores, Inc.*, 241 F.3d 603, 604 (7th Cir. 2001) ("Satisfaction of the ... duty of inspection and clean up[ ] does not require continuous patrolling of the aisles."). Instead, the *Rosales* court held that to prevail, the plaintiff in that case had to come forth with "additional evidence to show a pattern of incidents of the type at issue here that would provide Menards with notice that its policy. . . creates tripping hazards." *Id.*

As described above, Plaintiff here identifies no evidence to support her bare allegation that an abandoned cart is a hazard or that Menard had any reason to believe it was a hazard. Menard had no policy regarding abandoned shopping carts that could reasonably lead to an inference that Ms. Guzman's observation of the top of a rail cart put Menard on notice that the cart was a hazard that needed to be remediated. Moreover, unlike in *Rosales*, there is no evidence here that Menard knew customers regularly transported poles using rail carts or that they did so in such a way that

16

knowing of a cart left at the end of an aisle meant knowing that someone might trip over a pole likely to be protruding from that cart.

### 2. Menard Did Not Have Constructive Knowledge of the Hazard Created By the Pole.

The trial evidence here established that Plaintiff did not trip over a shopping cart. She tripped over a thin pole that protruded from the cart at an angle, and so the next part of the Court's inquiry must focus on whether Menard had constructive knowledge of the hazard caused by the pole before Plaintiff tripped over it.[13]

"Constructive knowledge can be established by presenting evidence that (1) the dangerous condition existed for a sufficient amount of time so that it would have been discovered by the exercise of ordinary care; or (2) the dangerous condition was part of a pattern of conduct or a recurring incident." *Barrios v. Fashion Gallery, Inc.*, 255 F. Supp. 3d 278, 731 (N.D. Ill. 2017) (citing *Zuppardi v. Wal-mart*, 770 F.3d at 649). Where a plaintiff alleges a defendant had constructive knowledge, timing is "of critical importance." *Torrez v. TGI Friday's, Inc.,* 509 F.3d 808, 811 (7th Cir. 2007) (citing *Tomczak,* 315 Ill. App. 3d at 1039). Absent any evidence demonstrating the length of time that the defective condition was present, a plaintiff cannot establish constructive notice. *Tomczak*, 315 Ill. App. 3d at 1039.

It is uncontroverted that no one at Menard saw the pole sticking out of the bottom of the cart before Plaintiff fell. As discussed above, the cart alone did not suggest or create a hazard, and therefore the Court can only uphold the jury's verdict if Menard had constructive notice of the pole protruding from the bottom of the cart at an angle. In this case, even making all inferences in favor

---

[13] In arguing that Menard did not have constructive notice, Defendant apparently concedes that the cart together with the protruding pole did constitute a hazard that could have given rise to premises liability if Menard had constructive knowledge of it.

17

of the Plaintiff, the Court is unable to conclude that Menard had constructive notice of that pole so as to give rise to liability for Plaintiff's trip and fall.

Illinois law recognizes that there is no bright-line rule indicating the requisite time to establish notice. *Hayes v. Bailey,* 400 80 Ill. App. 3d 1027, 1031 (3d Dist. 1980). Rather, courts look to the circumstances of the particular case to determine if the length of time gave rise to notice. *Peterson,* 241 F.3d at 605. Factors that bear on whether a substance that caused a slip-and-fall accident was there for a long enough time to establish constructive notice include not only the length of time the spill existed but also the surrounding circumstances such as the area where the spill occurred, the time the spill occurred, visibility of the spill, and the store's policies on patrolling its aisles for spills. *Waldron v. Target Corp.*, 622 F. Supp. 3d 708, 718 (N.D. Ill. 2022).[14] Importantly for the Court's determination here, in Illinois, courts have found no constructive notice where the hazardous substance existed for as much as 10 minutes before being discovered. *Reid v. Kohl's Dept. Stores, Inc.,* 545 F.3d 479, 481 (7th Cir. 2008) (spilled milkshake not on ground when manager walked by 10 minutes earlier).

In this case, even taking the facts in the light most favorable to Plaintiff, they do not establish that the rail cart sitting for as long as ten minutes with a pole protruding from the end put Menard on constructive notice of the hazard prior to Plaintiff tripping. The evidence is uncontroverted that unattended carts were a fairly common occurrence at Menard and not subject to any formal policy regarding their inspection or movement. Plaintiff presented no evidence that Menard had notice that customers regularly tripped over carts or over objects protruding from carts that would have created a duty of further inspection upon observation of the top of the rail cart that

---

[14] Although many of the cases cited by the parties concern a customer slipping on a foreign substance on the ground and not tripping over a hazard, the Court's analysis with respect to constructive knowledge is the same.

Ms. Guzman saw. And even though Ms. Guzman testified that she personally might consider a cart officially abandoned after five to six minutes, no evidence established either that she observed this particular rail cart sitting alone for that long or that she even considered it to be "officially abandoned," as she put it. Simply put, there is not enough evidence to allow a rational jury to find that Menard had constructive notice about the cart and pole prior to Plaintiff's fall, and thus the jury's verdict in favor of Plaintiff cannot stand under Rule 50(b).

## CONCLUSION

For the reasons stated above, the Court GRANTS Defendant's Rule 50(b) motion for judgment as matter of law and reverses the jury's finding for Plaintiff.

**SO ORDERED.**

**ENTER:**

**GABRIEL A. FUENTES**
**United States Magistrate Judge**

**DATED: October 24, 2024**